# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

MAXELL LTD.,

§
§

*Plaintiff,*

§
§

Case No. 5:16-cv-00179-RWS

v.

§
§

**JURY TRIAL DEMANDED**

ZTE (USA) INC.,

§
§

*Defendant.*

§
§
§
§

---

**PLAINTIFF MAXELL, LTD.'S RESPONSE TO DEFENDANT ZTE (USA), INC.'S
RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A
NEW TRIAL PURSUANT TO FEDERAL RULE 59**

## <u>TABLE OF CONTENTS</u>

**Page**

I.     THE COURT SHOULD DENY ZTE'S REQUEST FOR JUDGMENT AS A MATTER OF LAW. ................................................................................................................ 1

A.     Legal Standard ................................................................................................. 1

B.     '794 Patent ....................................................................................................... 2

       1.     *The record includes substantial evidence that the ZMAX 2 includes a controller for controlling operation based on remaining capacity.* .........................................................................................2

       2.     *The record includes substantial evidence that the controller sends a power consumption reduction instruction to each function device in a set GA.* ...............................................................................5

       3.     *Sets GA and GB do not overlap.* .................................................9

       4.     *Dr. Phinney complied with the Court's claim construction order.* ............10

C.     '317 Patent ..................................................................................................... 11

D.     '493 and '729 Patents..................................................................................... 15

       1.     *Substantial evidence supports the verdict that ZTE infringes claim 5 of the '493 Patent.* ...............................................................15

       2.     *Substantial evidence shows infringement of claim 1 of the '729 Patent.* ................................................................................24

E.     '491 and '695 Patents..................................................................................... 31

       1.     *Substantial evidence supports the jury's verdict that ZTE infringed claim 8 of the '491 Patent.* .....................................................31

       2.     *Substantial evidence supports the jury's verdict that ZTE infringed claim 1 of the '491 Patent.* .....................................................33

       3.     *Substantial evidence supports the jury's verdict that ZTE infringed the '695 Patent.* ...........................................................36

F.     '193 Patent ..................................................................................................... 36

       1.     *Substantial evidence supports a finding that the accused devices include a* ███████ ███████████ *."* ...........................36

       2.     *Substantial evidence supports finding the ZMAX 2 includes* ███ ████████████████ ████████ ....................................40

## TABLE OF CONTENTS
### (continued)

Page

II.   MARKING IS NO BASIS TO REDUCE DAMAGES.................................................. 44

    A.   Legal standards ................................................................................................ 44

    B.   The marking issue is limited to the Casio G'zOne and a subset of patents. ......... 45

    C.   ZTE failed to meet its burden of producing evidence that Casio did not
         mark the G'zOne. ............................................................................................ 45

    D.   ZTE failed to meet its burden of producing evidence that the G'zOne
         practices a claim of any asserted patent. .............................................................. 46

    E.   The Court should not reduce the damages award. ................................................ 47

III.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S WILLFULNESS VERDICT.
       .................................................................................................................... 48

    A.   ZTE USA knew of the asserted patents. .............................................................. 48

         1.   *Maxell presented substantial evidence that ZTE Corporation was*
              *aware of each asserted patent before the complaint.* ...............................*48*

         2.   *Maxell presented substantial evidence for the jury to impute ZTE*
              *Corporation's knowledge of the patents to ZTE USA.*...............................*51*

    B.   ZTE USA knew or should have known its conduct risked infringement. ............ 53

         1.   *ZTE cannot defend by arguing it believed the patents were invalid.*..........*53*

         2.   *Substantial evidence supports the jury's finding that ZTE knew or*
              *should have known of a high risk that ZTE was infringing.* .......................*55*

IV.   THE COURT SHOULD NOT REDUCE THE JURY'S DAMAGES AWARD AND
      REPLACE IT WITH ITS OWN DETERMINATION AS TO AN ONGOING
      ROYALTY RATE .................................................................................................... 58

V.   THE '317 AND '794 ARE VALID UNDER SECTION 101 .......................................... 61

VI.   ZTE IS NOT ENTITLED TO A NEW TRIAL .................................................................. 63

    A.   Legal Standard .................................................................................................... 63

    B.   Public Events Did Not Deny ZTE A Fair Trial. ................................................... 64

         1.   *The Court properly screened for prejudice via voir dire.*............................*64*

         2.   *ZTE has not demonstrated a presumption of prejudice.* ............................*66*

         3.   *ZTE has not demonstrated any actual prejudice.* ......................................*68*

    C.   The Closing Argument Does Not Warrant A New Trial. ...................................... 69

## TABLE OF CONTENTS
### (continued)

D.    Admission Of Prior Licensing Negotiations To Establish Willfulness Does Not Warrant A New Trial. ................................................................................. 70

     1.    *FRE permits disclosure of prior licensing negotiations.* ..........................71

     2.    *The NDA does not prohibit disclosure of prior licensing negotiations.*.............................................................................................72

     3.    *ZTE invited any arguable error.* ...............................................................74

E.    A New Trial Is Not Warranted Based on ZTE's Allegation Regarding the Entire Market Value Rule. .................................................................................. 74

     1.    *ZTE did not object to evidence of the total revenues of the accused products.*.....................................................................................................74

     2.    *There was no error or prejudice.*...............................................................77

F.    Ms. Mulhern's Reference To The *MMI* Rate Does Not Warrant a New Trial.   78

VII.    CONCLUSION................................................................................................... 80

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
707 F.3d 1318 (Fed. Cir. 2013).............................................................35

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*,
501 F.3d 1307 (Fed. Cir. 2007)...............................................................1

*Am. Home Assur. Co. v. United Space All., LLC*,
378 F.3d 482 (5th Cir. 2004) ..................................................................1

*Apple Inc. v. Samsung Elecs. Co.*,
258 F. Supp. 3d 1013 (N.D. Cal. 2017) ................................................57

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016)...............................................................1

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017).................................................44, 45, 54

*Baisden v. I'm Ready Prods., Inc.*,
693 F.3d 491 (5th Cir. 2012) ..........................................................69, 70

*Barry v. Medtronic, Inc.*,
230 F. Supp. 3d 630 (E.D. Tex. 2017)...................................................54

*Bilski v. Kappos*,
561 U.S. 593 (2010).................................................................................61

*Blitzsafe Texas, LLC v. Volkswagen Grp. Of Am., Inc.*,
No. 2:15-cv-1274, 2016 WL 4778699 (E.D. Tex. Aug. 19, 2016)........48

*Commil USA, LLC v. Cisco Sys.*,
135 S. Ct. 1920 (2015)............................................................................55

*Desert Palace, Inc. v. Costa*,
539 U.S. 90 (2003).................................................................................50

*Dura. Auto. Sys. Of Ind., Inc., v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ...........................................................41, 42

*EEOC v. Boh Bros. Constr. Co.*,
731 F.3d 444 (5th Cir. 2013) ...................................................................1

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
   2017 WL 3034655 (E.D. Tex. July 18, 2017) ...............................................58, 59

*Ericsson, Inc. v. D-Link Sys.*,
   773 F.3d 1201 (Fed. Cir. 2014).....................................................................1, 21

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
   No. 2:15-CV-00011-RSP, 2018 WL 2149736 (E.D. Tex. May 10, 2018) .................54, 58, 60

*France Telecom S.A. v. Marvell Semiconductor Inc.*,
   82 F. Supp. 3d 987 (N.D. Cal. 2015) .................................................................71

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011).........................................................................................51

*Hall v. Freese*,
   735 F.2d 956 (5th Cir. 1984) .............................................................................69

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   136 S. Ct. 1923 (2016)................................................................................54, 56

*Hewlett-Packard Co. v. Mustek Sys.*,
   340 F.3d 1314 (Fed. Cir. 2003)........................................................................2, 6

*IBM v. Groupon, Inc.*,
   2018 U.S. Dist. LEXIS 100333 (D. Del. June 15, 2018)........................................73

*InCom Corp. v. Walt Disney Co.*,
   CV15-3011 PSG (MRWx), 2016 WL 4942032 (C.D. Cal. Feb. 4, 2016).............................53

*Ironworks Patents, LLC v. Apple, Inc.*,
   Civ. No. 10-258-SLR, D.I. 748 (D. Del. Jun. 12, 2017)........................................79

*In re Isbell Records, Inc.*,
   774 F.3d 859 (5th Cir. 2014) .............................................................................70

*James Corp. of Opelousas v. Tangie Const. Co.*,
   7 F.3d 230 (5th Cir. 1993) ................................................................................76

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
   628 F.3d 1359 (Fed. Cir. 2010).........................................................................23

*LinkCo, Inc. v. Fujitsu Ltd.*,
   232 F. Supp. 2d 182 (S.D.N.Y. 2002).................................................................58

*Mayola v. Alabama*,
   623 F.2d 992 (5th Cir. 1980) ........................................................................66, 67

*Milwaukee Elec. Tool Corp. v. Snap-on Inc.*,
    288 F. Supp. 3d 872 (E.D. Wis. 2017)..................................................................78

*MobileMedia Ideas, LLC v. Apple Inc.*,
    209 F. Supp. 3d 756 (D. Del. 2016)....................................................................79

*Mondis Tech., Ltd. v. LG Elecs., Inc.*,
    No. 2:07-CV-565-TJW-CE, 2011 WL 2417367 (E.D. Tex. June 14, 2011)..........................77

*Monolithic Power Sys., Inc. v. Silergy Corp.*,
    127 F.Supp.3d 1071 (N.D. Cal. 2015) ..........................................................50, 51

*In re MSTG, Inc.*,
    675 F.3d 1337 (Fed. Cir. 2012)........................................................................78

*Narcisse v. Ill. C. G. R.R. Co.*,
    620 F.2d 544 (5th Cir. 1980) ...........................................................................63

*Optis Wireless Tech., LLC v. Huawei Techs. Co.*,
    2:17-cv-00123-JRG-RSP, 2018 WL 3375192 (E.D. Tex. July 11, 2018) ..............................55

*Princeton Dig. Image Corp. v. Harmonix, Music Sys.*,
    No. 12-1461-LPS-CJB, 2018 WL 1890200 (D. Del. Apr. 16, 2018) ...................................52

*ReefEdge Networks, LLC v. Juniper Networks, Inc.*,
    29 F. Supp. 3d 455 (D. Del. 2014)......................................................................53

*Rolls-Royce Ltd. v. GTE Valeron Corp.*,
    800 F.2d 1101 (Fed. Cir. 1986)........................................................................52

*SAP Am., Inc. v. InvestPic, LLC*,
    890 F.3d 1016 (Fed. Cir. 2018)........................................................................62

*Sentius Int'l v. Microsoft Corp.*,
    No. 5:13-cv-00825-PSG, 2015 WL 451950 (N.D. Cal. Jan. 27, 2015)................................78

*Sheppard v. Maxwell*,
    384 U.S. 333 (1966)................................................................................67, 68

*Skilling v. U.S.*,
    561 U.S. 358 (2010)............................................................................... *passim*

*Smith v. Transworld Drilling Co.*,
    773 F.2d 610 (5th Cir. 1985) ...........................................................................63

*Software Research, Inc. v. Dynatrace LLC*,
    No. 18-cv-00232-EMC, 2018 WL 3241043 (N.D. Cal. July 3, 2018) ..................................53

*Sprint Commc'ns Co. v. Comcast Cable Commc'ns LLC*,
  225 F. Supp. 3d 1233 (D. Kan. 2016) ...................................................................78

*SSL Servs., LLC v. Citrix Sys.*,
  940 F. Supp. 2d 480 (E.D. Tex. 2013), aff'd, 769 F.3d 1073 (Fed. Cir. 2014) ................64, 75

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015)...........................................................................58

*Threlkeld v. Total Petroleum, Inc.*,
  211 F.3d 887 (5th Cir. 2000) .................................................................................1

*Thurmond v. Compaq Comput. Corp.*,
  No. 1:99-CV-0711(TH), 2000 WL 33795090 (E.D. Tex. Mar. 1, 2000) ...............................64

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*,
  761 F.3d 409 (5th Cir. 2014) ..........................................................................63, 78

*U.S. v. Chagra*,
  669 F.2d 241 (5th Cir. 1982) ...............................................................................68

*U.S. v. Valas*,
  822 F.3d 228 (5th Cir. 2016) ...............................................................................78

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)......................................................................2, 75, 77

*United States v. Pratt*,
  728 F.3d 463 (5th Cir. 2013) ...............................................................................68

*Wallner v. Ziegler*,
  470 F. App'x 230 (5th Cir. 2012) .........................................................................69

*Waterman v. McKinney Indep. Sch. Dist.*,
  No. 15-40458, 2016 WL 1127429 (5th Cir. 2016) .................................................80

*Welch v. All Am. Check Cashing, Inc.*,
  No. 3:13-CV-271-TSL-JCG, 2015 WL 4066495 (S.D. Miss. July 2, 2015) .........................69

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
  837 F.3d 1358 (Fed. Cir. 2016)...........................................................................56

*ZiiLabs Inc., Ltd. v. Samsung Elecs. Co.*,
  2015 WL 8293585 (E.D. Tex. Dec. 8, 2015)...........................................................71, 72, 73

*ZitoVault, LLC v. IBM Corp.*,
  No. 3:16-CV-0962-M, 2018 WL 2971131 (N.D. Tex. Mar. 29, 2018)..............................53, 57

**Statutes**

35 U.S.C. § 282............................................................................................................54

**Other Authorities**

*Fed. Prac. & Proc. Evid.* § 5122 ..............................................................................47

Fed. R. Civ. P. 61 .............................................................................................63, 70, 80

Fed. R. Evid. 103(a)................................................................................................63, 75

Fed. R. Evid. 408 .........................................................................................................71

## I.   The Court Should Deny ZTE's Request for Judgment As A Matter Of Law.

### A.   Legal Standard

In addressing a Rule 50(B) motion, the Court determines whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assur. Co. v. United Space All., LLC*, 378 F.3d 482, 487 (5th Cir. 2004). "A jury verdict must stand unless there is a lack of substantial evidence, in the light most favorable to the successful party, to support the verdict." *Id.*

Substantial evidence is that which would cause reasonable jurors "in the exercise of impartial judgment [to] reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A court should "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that we might regard as more reasonable." *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 452 (5th Cir. 2013). The Fifth Circuit is "especially deferential" to jury verdicts, and it does not "tamper lightly with … a judgment that is representative of the good common sense of the American people." *Id.* at 451-52.

"A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007). "Substantial evidence to support the jury's finding" of infringement can be found from the testimony of expert witnesses, even if contested. *See*, *e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1044-45 (Fed. Cir. 2016); *EEOC*, 731 F.3d at 452 ("it is the function of the jury… [to] determine the credibility of witnesses"). The "jury verdict should be upheld if there is sufficient evidence to support any of the plaintiff's alternative factual theories." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014).

1

"When issues of claim construction have not been properly raised in connection with the jury instructions, it is improper for the district court to adopt a new or more detailed claim construction in connection with the JMOL motion." *Hewlett-Packard Co. v. Mustek Sys.*, 340 F.3d 1314, 1320 (Fed. Cir. 2003). Disputes about the meaning of claim language are reviewed only for a lack of substantial evidence under the "traditional rule for review of jury verdicts of factual issues." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1302 (Fed. Cir. 2011).

**B.    '794 Patent**

    *1.    The record includes substantial evidence that the ZMAX 2 includes a controller for controlling operation based on remaining capacity.*

ZTE does not dispute that the ZMAX 2 includes a controller that controls operation of the phone's functional devices. *See* Dkt. 257 at 32:7-33:14, 33:15-25 (█████████████████ ████████████████████████████████████████████████████████ ████████████████████████████). Instead, it argues there was no evidence that this controller performs "based on … remaining [battery] capacity." Mot. 3-5. But Maxell offered evidence supporting three independent grounds for the jury to find this limitation satisfied. While any one ground is sufficient, the Court should reject ZTE's motion on all three.

*First*, the ZMAX 2 infringes by controlling several function devices in "power saver mode." Dr. Phinney testified that, while in that mode, the ZMAX 2 "control[s] operation of the function devices **based on the remaining capacity** ███████████████████████████ █████████████████████████████████████████████████████████ ██████████████████████. He stated that when the phone entered "power saver" mode, "the WiFi dropped" and Bluetooth was disabled. Dkt. 239 at 60:25-61:16. Dr. Phinney also testified that ███████████████████████████." Dkt. 257 at 37:9-10.

Dr. Phinney's testimony shows that, when in "power saver mode," the ZMAX 2 (not the

2

user) sends power consumption reduction instructions to control these function devices:

> Q. So in [Power Saver mode], is the user issuing the power consumption
> reduction instruction?
> A. No.
> Q. Who's issuing it?
> A. The controller issues it. It's like a thing that occurs within the guts of the phone
> to actually make function devices reduce power consumption.

Dkt. 258 at 62:13-19.

Also, when the ZMAX 2 reaches critically low capacity, it initiates a "controlled"

shutdown. █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

ZTE argues that ZMAX 2's power reduction actions do not infringe because it "does not

enter power saver mode unless a user authorizes it to do so" when prompted. Mot. 3. But that is

irrelevant. Claim 1 does not require that the controller control operation of the function device

"based **only** on" the remaining capacity or "on nothing but" the remaining capacity. The claim

does not **preclude** a user from authorizing the mode. User authorization is immaterial to whether

the actions the phone takes in "power saver mode" are "based … remaining capacity."

Thus, the jury had substantial evidence to conclude that, when in the "power saving

mode," the ZMAX 2 controls several function devices based on "remaining [battery] capacity,"

namely, the WiFi, Bluetooth, and cellular modems, and the display.

*Second*, the accused product infringes this limitation when in "battery saver mode." The

ZMAX 2 enters "battery saver mode" only when the battery capacity depletes to a pre-set

threshold (*e.g.*, 15%). *See* Dkt. 257 at 32:21-23 ("when the battery is depleted to some level, NA, this is the 15 percent, the user is prompted to authorize the entry into power save mode."). Dr. Phinney testified that, when the phone enters the "battery saver mode," "the controller … restrict[s] the background data so that your phone is able to put the … WiFi modem … to sleep where there's no user interaction." *Id.* at 33:7-14. ZTE's expert agreed that, in "battery saver mode," the ZMAX 2 reduces the WiFi modem's power consumption by restricting background data. *See* Dkt. 244 at 26:21-27:3 ("… because it's doing less work it's probably consuming less power."). Thus, in the "battery saver mode," the WiFi modem usage is reduced; █████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

██████████████████████████████████████████

██████████████████████████████████

Dkt. 257 at 40:17-21.

Dr. Phinney further testified that, in "battery saver mode," the phone controls the display by dimming it. *See* Dkt. 239 at 57:23-58:7. And similar to "power saver mode," he testified that, when the ZMAX 2 reaches a critically low capacity, it initiates a "controlled" shutdown process, whereby the controller sends "an instruction to stop the cellular modem." Dkt. 257 at 44:10-14, 45:14-19. *See also* Dkt. 244 at 28:3-9 (Dr. Wolfe corroborating Dr. Phinney's testimony).

ZTE ignores the control of the display *and* the cellular modem altogether. Instead, ZTE argues that the controller purportedly "does not control operation of the WiFi modem based on remaining capacity" because Dr. Wolfe purportedly observed the WiFi modem "operat[ing] normally while the ZMAX 2 was in battery saver mode." Mot. 4. But that disregards the fact

that, during "battery saver mode," the ZMAX 2 **restricts** usage of the WiFi, causing ████████
██████████████████████████████

Further, ZTE is wrong that "Dr. Phinney did not provide any evidence to show that the WiFi modem works in a low power way in battery saver mode." Mot. 4. ██████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████

Based on this evidence, a reasonable jury could have found that the ZMAX 2 infringes through its "battery saver mode," wherein it controls the WiFi modem, display, and cellular modem's operation based on remaining capacity.

*Third*, the ZMAX 2 includes a controller that supplies or removes power from individual function devices—another form of "control." Dr. Phinney testified that, ██████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

2.     *The record includes substantial evidence that the controller sends a power consumption reduction instruction to each function device in a set GA.*

ZTE is wrong to argue there is no evidence the ZMAX 2 sends a power consumption reduction instruction to any of the devices. Mot. 5-9. Substantial evidence supports the jury's

verdict that at least one device in GA (*i.e.*, the WiFi modem, Bluetooth modem, or display) and

one device in GB (*i.e.*, the cellular modem) receives a power consumption reduction instruction.

ZTE begins by obfuscating the claim requirement. ZTE asserts that, for "battery saver

mode," the "function devices in set GA" are the WiFi modem and display. Mot. 5. And, for

"power saver mode," the WiFi modem, Bluetooth modem, and the display. *Id*. ZTE then asserts

that Maxell had "to show evidence of a power consumption reduction instruction to **each** of

these function devices." *Id*. (emphasis added). This fails for two separate reasons.

*First*, ZTE cannot rest on this supposed limitation in Claim 1 because it never before

argued it. ZTE cannot narrow the claim language through post-trial briefing. *See Hewlett-*

*Packard*, 340 F.3d at 1320. ZTE misunderstands the claim. Claim 1 requires one or more

"function device" as part of "the set GA" and one or more "function device" of "a set GB." *See*

'794 Patent at 8:39-46. Thus the claims no doubt require at least two devices that receive a power

reduction instruction at different times; at least one device must be in each of set GA and GB.

For set GA, Dr. Phinney identified three potential components that qualify: the WiFi modem,

Bluetooth modem, and display. Dkt. 257 20:24-21:22; Ex. 4, PDX-029 at 50. So long as **one** of

those components receives the relevant power shutdown instruction, there is a "function device"

and the claim is infringed. Put differently, whether a component receives a relevant instruction

defines whether a component qualifies as a "function device." ZTE's assertion (Mot. 5) that

Maxell had to prove **each** of the WiFi modem, the Bluetooth modem, and the display received

such an instruction is flatly wrong. *See also* Dkt. 240 at 29:21-25 and Dkt. 258 at 65:21-66:10.

*Second*, the jury had sufficient evidence to find that **all** three devices receive power

consumption reduction instructions. But Maxell only had to offer proof of one.

For example, Dr. Phinney testified that the operation of the device confirms that

instructions were sent to the "function devices." That is, the results of the power saver and battery saver modes—*i.e.*, reduced power consumption in various components—indicate that the controller issues consumption reduction instructions. When the phone enters the "power saver mode," for example, it dims the display and turns off or disables certain modems. *See, e.g.*, Dkt. 257 at 33:1-6. Dr. Phinney explained that when the phone enters these modes it "need[s] to actually send instructions to things to tell them to reduce their power consumption." Dkt. 257 at 39:8-10; *see also id.* at 39:21-40:1; Dkt. 258 at 31:19-23.

With respect to the display function, Dr. Phinney walked through a video of the phone's entry into "battery saver mode," at which point the display dims. Dkt. 239 at 56:5-59:7. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

As Dr. Phinney explained, the accused device necessarily issues a power consumption reduction instruction to direct the function device what to do (*e.g.*, power down):

> [T]here's something in the phone that makes the determination it's time to enter one of these power saving modes. So if you think about that determination in software, it's now sort of telling other software components, you know okay, we're entering this mode. And you see that instruction … having different forms but ultimately having the same effect at the end on hardware. So it's possible to identify different forms of the instruction, but they all really have the same effect. They're bearing the same information about what is to be done by the fact the phone has entered a power saving mode.

*Id.* at 48:15-49:1. This was evidence enough to support the verdict: Maxell need not provide the precise label of the signal; it merely had to provide evidence to allow a reasonable jury to make the inference that the device sends a signal of the sort claimed. Dr. Phinney did precisely that.

Dr. Phinney, however, went further and showed **particular** signals that a reasonable jury could find were the claimed instruction. For the display, ████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████. But the ultimate point remains: Dr. Phinney testified that a claimed

signal **must** be sent, and the jury was reasonable to agree.

The jury also could have found infringement under the doctrine of equivalents. The Court

instructed that ZTE infringes if the differences between an element of the accused product and of

the claim are "insubstantial." *See* Dkt. 223 at Section 5.3. The jury could have concluded the

difference—that the PWM is not the claimed instruction but is **caused** by it—was insubstantial

and ZTE infringed under the doctrine of equivalents. *See* Dkt. 257 at 47:23-49:10.

Dr. Phinney also provided sufficient evidence to show that the WiFi and Bluetooth

modems receive the claimed consumption reduction instruction. This is yet another basis on

which the jury's verdict is supported. He testified that the ZMAX 2's WiFi and Bluetooth

modem is disabled when the phone enters "power saver mode." Dkt. 239 at 60:6-61:16. This

implies that the modem receives a consumption reduction instruction (either literally or under the

doctrine of equivalents) when it enters "power saver mode." ZTE does not disagree, but instead

argues that the WiFi modem operates normally in the "**battery** saver mode." That is inadequate

and false. It is inadequate because a reasonable jury could have still found infringement based on

the "**power** saver mode." It is false because the evidence demonstrated the ZMAX 2 does control

operation of the WiFi modem in "battery saver mode," by restricting its use in that mode. *See*

*supra*.

Similarly, substantial evidence supports the verdict that the cellular modem receives a

power consumption reduction instruction—which is the "function device of the set GB." Dr.

Phinney explained that the cellular modem receives the claimed instruction during the phone's

8

shutdown sequence. Dr. Phinney opined that when the battery depletes to 0%—regardless of

whether the phone is in "power saver mode" or "battery saver mode"— █████████████

█████████████████████████████████████████████. Dkt. 257 at 44:4-14.

The result is "an **instruction** to stop the cellular modem." *Id.* at 45:13-19 (emphasis added).



. Thus, the accused product satisfies the signal

claim limitation, whether literally or under the doctrine of equivalents.

###        3.        *Sets GA and GB do not overlap.*

ZTE next argues that there is no infringement because "the WiFi modem is in both set

GA and set GB." Mot. 9. That is not true, and it is anyway insufficient to overturn the verdict.

*First*, Dr. Phinney testified unequivocally that the WiFi modem is a low priority function

device that is in set GA, not in GB:



Dkt. 240 at 27:24-28:3.

Dr. Phinney was equally clear that set GA does not overlap with set GB:

Q. And I noticed that the devices that you identify for set GA, that those don't
overlap with what you've identified for set GB. Why is that?
A. The real reason is that the cellular modem is related to voice calling, and that is
a high priority function. You know, that's ... what I want my phone to do. And if I
had very little battery remaining, you know what, it's time to stop using all the
bells and whistles on the phone so that I can do the thing that matters most, which
is sending and receiving an emergency phone call.

Dkt. 257 at 36:7-16. Thus, a reasonable jury could have concluded that the WiFi modem is in

GA and not in GB. *See also id.* at 44:4-14 (identifying ShutdownThread and shutdownRadios),

45:13-19 (identifying "instructions to disable" and "stop" the cellular modem).

ZTE fails to explain why it is relevant that Dr. Phinney accidentally identified a WiFi

modem signal as a cellular modem signal. It does not explain why this misidentification—which

Dr. Phinney promptly corrected—would have *compelled* a reasonable jury to conclude that the

WiFi modem is also in GB, notwithstanding Dr. Phinney's extensive testimony to the contrary.

*Second*, even if ZTE were correct that the WiFi modem were powered down at both NA

and NB, a reasonable jury could have still found infringement based on the theory that GA

includes the display or Bluetooth modem and GB includes the cellular modem. Again, the claims

only require that each set GA and GB include a single function device. There is no requirement

that the WiFi modem need be counted in either set.

### 4.  Dr. Phinney complied with the Court's claim construction order.

Dr. Phinney adhered to the Court's construction of "function device." The Court con-

strued it as a means-plus-function term whose corresponding structure included "modem devices,

audio communication devices and videophone devices." Dkt. 49 at 103. Dr. Phinney testified

that the display is a videophone device: "I also regard this as a videophone device, for instance,

because … this would be where you can …see someone and talk to them at the same time. The

display is a necessary part of that." Dkt. 257 at 19:13-25. This is consistent with the Court's

claim construction, and is substantial evidence for the jury's finding that the display qualifies.

ZTE attempts to contrast Dr. Phinney's direct testimony with irrelevant portions of his

infringement report, submitted **before** this Court issued its claim construction order. *See* Dkt.

258 at 74:3-9 ("Q. And would it be fair to say that you had to consider a number of potential

claim constructions at the time you were preparing this report? A. Yes. And…so I attempted to be very complete in showing all the possible candidate function devices…with the understanding that as the claim construction filing—when that did come, that this could be narrowed."). Dr. Phinney's **trial testimony** is what is relevant, and he said nothing on direct about the term "common device," let alone in the context of the phone's display.

Rather, Dr. Phinney explained why and how the function devices that he identified—the modems and the display of the phone—are function devices equipped with "independent" functions. Dr. Phinney testified that a display "can have an independent function because it's doing something that nothing else can." Dkt. 258 at 22:5-10. A reasonable juror could have determined based on the testimony and evidence proffered by Dr. Phinney that the display on the ZMAX 2 is a videophone device equipped with an independent function. That ZTE disagrees with this application of the claim term is no basis for reversing the jury's verdict.

Lastly, this issue is not a basis to reverse because the verdict is independently supported by Dr. Phinney's testimony with respect to the WiFi modem and the Bluetooth modem.

## C.     '317 Patent

The Court should not set aside the jury's infringement verdict respecting the '317 Patent. ZTE argues there is "no evidence that the version of the AT&T Navigator distributed with the Accused Device infringes the '317 Patent" because (1) ZTE purportedly sells the ZMAX 2 with version 5.3.3.1 ("v.5.3") of the software, rather than the version Maxell's expert tested ("v.5.10") and (2) ZTE's expert testified that, "[i]n at least one example," he did not believe that the earlier version infringed. Mot. 11-15. As a preliminary matter, it is the ZMAX 2 that infringes, not the navigation application on its own. Moreover, the Court rejected this argument at summary judgment (Dkt. 181 at 4-5), and it should do so again here.

    1.    *Substantial evidence supports a finding that ZTE pre-installed the tested version of the navigation application on the ZMAX 2.*

The trial record includes substantial evidence from which a reasonable jury could have concluded that ZTE sold the ZMAX 2 with v.5.10 of the navigation application preinstalled. This evidence alone is sufficient to reject ZTE's motion with respect to the '317 Patent.

At trial, a factual dispute arose regarding the version of the application ZTE preinstalled on the ZMAX 2. Dkt. 242 at 38:14-23. ZTE's expert (Mr. Andrews) contended the ZMAX 2 came with v.5.3 preinstalled. *Id.* Maxell's expert (Dr. Caloyannides) disagreed because he purchased and tested a new ZMAX 2 with v.5.10 preinstalled. *Id.; see also* Dkt. 232 at 83:10-20. Both experts relied on the same methodology. Each purchased a new ZMAX 2 and recorded which version of the application was preinstalled. *Compare* Dkt. 242 at 36:11-37:9 (Mr. Andrews) *with* Dkt. 232 at 26:24-27:10 (Dr. Caloyannides).

Dr. Caloyannides repeatedly testified that his analysis relied on the version of the software "that the phone came with." Dkt. 232 at 26:24-27:10, 83:10-20, 92:3-16, 96:5-12, 96:25-97:2, 97:18-24, 98:21-99:3; *see also* Dkt. 250 at 11:11-19 ("the version I tried is the one I got from the store, I opened it, turned it on, and that's what it did"); *id*. at 89:9-11, 89:16-25. ZTE cross-examined him at length about this, and he confirmed each time that he did not update the software on the phone he purchased. Dkt. 232 at 26:24-27:10, 83:10-20, 92:3-16, 96:5-12, 96:25-97:2, 97:18-24, 98:21-99:3; *see also* Dkt. 250 at 11:11-19, 89:9-11, 89:16-25.

When questioned about why the two phones apparently had different versions of the application installed, ZTE's expert explained that "it's very common to have different kind – different versions of software out in the field" (Dkt. 242 at 36:1-7) and that "there could be" different preinstalled versions of software on the phone (Dkt. 260 at 74:8-10). He testified that he did not know whether "there is only one release of the AT&T Navigator that has ever come

preinstalled on any phone," and he did not ask anyone at ZTE "if there was more than one version of AT&T Navigator on the ZTE ZMAX 2 phone." Dkt. 260 at 69:11-16, 74:17-20.

Substantial evidence supports a finding that ZTE sold ZMAX 2 phones with v.5.10 pre-installed. Dr. Caloyannides presented evidence that those phones infringed, and ZTE does not now dispute that evidence. The record thus contains substantial evidence from which a reasonable jury could have found that ZTE infringed the '317 Patent.

> 2.    *Substantial evidence supports a finding that ZTE infringed by selling ZMAX 2 phones with either version of the navigation application preinstalled.*

ZTE's motion is wrong for the additional reason that there was substantial evidence that the ZMAX 2 phone infringes regardless of the version of the navigation application.

██████████████████████████████████████████████████████

████████████████████████████████████    Thus, there was sufficient evidence to conclude

the ZMAX 2 includes the claimed "device for getting direction information denoting an

orientation."

*Second*, substantive evidence demonstrated that the ZMAX 2's "display changes

according to a change of … direction," even when running v.5.3 of the application. Dr. Caloyan-

nides testified that v.5.3 changes the display according to a change of direction by reorienting the

map in two scenarios: (1) when the user turns, the map reorients in the direction the user is

facing, and (2) when the user rotates the phone between landscape and portrait modes, the

display changes. Dkt. 250 at 16:9-13; Dkt. 232 at 99:11-12 ("Everything was the same except for

the initial splash screen"); *see also* Ex. 7, PDX026 at 40-41.

Dr. Caloyannides confirmed this functionality is identical on the device with either v.5.3

and v.5.10. Dkt. 232 at 33:10-24 ("when one starts moving around town, I saw no difference").

When shown side-by-side playback of the reorientation functionality on the phone with

different versions of the application, ZTE's expert agreed the functionality was similar for the

two phones. *See* Dkt. 261 at 33:11-21 (discussing playback videos DPX-0005 and PDX-0027).

He admitted the ZMAX 2 he tested "finds my new position, and it reorients the map." Dkt. 242

at 126:15-20. This comports with Dr. Caloyannides's testimony that, regardless of the version

pre-installed, "the phone responds to turns and also responds to change in orientations of the

phone." Dkt. 250 at 89:16-21. The jury also may not have credited ZTE's expert due to the

technical issues he experienced. *See, e.g.*, Dkt. 243 at 16:15-25 (issues testing under steel

awning); *id.* at 17:1-20 (problems connecting to the server).

The record contains substantial evidence from which a reasonable jury could have concluded that ZMAX 2 phones infringe with either version of the navigation application.

### D.     '493 and '729 Patents

In seeking to overturn the jury's verdict for the '493 and '729 Patents, ZTE quibbles with technical details that, ultimately, highlight factual disputes—disputes that the jury resolved in Maxell's favor. ZTE's Rule 50(b) Motion should be denied for these patents.

> *1.     Substantial evidence supports the verdict that ZTE infringes claim 5 of the '493 Patent.*

ZTE raises two challenges to the jury's finding of infringement of claim 5 of the '493 Patent. *First*, it argues that ZTE's products do not "mix[] or cull[]" vertically arranged pixel lines. Mot. 15-20. And, *second*, it argues that claim 5 requires using every single pixel line in the image sensor array and that the accused products do not. *Id*. at 20-22. Both arguments fail.

#### a)     *Limitations 5[e] / 5[f] ("mixing or culling")*

ZTE argues that its products do not generate image signals by mixing or culling pixel lines at intervals (as claim 5 requires), but ███████████████████████████ Mot. 15-20. But Maxell presented substantial evidence that (1) the devices **do** process images by mixing or culling pixel lines at intervals, and (2) even if they ████████████, they still infringe.

*First,* Maxell provided substantial evidence that the representative products (the Axon 7 and Max Duo LTE) generate image signals by mixing or culling pixel lines. It presented expert testimony from Dr. Madisetti, who analyzed ZTE's source code (PX-173) and ZTE's own representations about how their phones operate. Ex. 8, PX-102; Ex. 9, PX-103; Ex. 10, PX-106; Dkt. 259 at 29:1-31:8. He explained that he "reviewed the exact Qualcomm code that interfaced with the sensor," "reviewed the various specifications and the data sheets," and "performed a teardown to take actual photographs of the sensors." Dkt. 259 at 41:21-42:14. Based on this

15

review, Dr. Madisetti concluded that the products meet limitations 5[e] and 5[f].

As to the Axon 7, Dr. Madisetti reviewed the "code" that "describes what is occurring in Android." *Id*. at 30:21-23. He explained that ████████████████████████ ████████████████████████████████████████████████ Dkt. 259 at 30:24-31:3. ██████████████████████████████████████ ███████ *Id*. at 31:6-7. This showed the fixed distance between lines skipped. He conducted extensive analysis—source code and other ZTE documents—to show how the accused devices monitor and record video. He showed that the Axon 7 mixes or culls, per limitation 5[e] (*id*. at 29:1-32:14) and per limitation 5[f] (*id*. at 38:21-40:5), and that the Max Duo LTE mixes or culls, per limitation 5[e] (*id*. at 32:15-34:14) and 5[f] (*id*. at 40:7-41:14). *See also id*. at 38:5-11 (discussing mixing and culling generally); Ex. 8, PX-102 at 3; Ex. 9, PX-106 at 1; PX-173 at SC_74-78, 199-210, 471-85; Ex. 11, PX-343 at MAXELL_HU-ZTE0008363-64.

Dr. Madisetti explained how the source code shows mixing or culling so that the 5952 vertically arranged pixel lines used for taking high-resolution still images reduce to the 2560 vertically arranged pixel lines used for monitoring in still image mode. Dkt. 259 at 31:9-32:14 (also discussing Ex. 8, PX-102).

 

He demonstrated "a simpler way of describing the Android code" (*id.* at 31:10-11), and testified that this was how the code worked (*id.* at 31:21-22).

ZTE criticizes Dr. Madisetti for pointing to "comments" in the Android code during his presentation. Mot. 17 (although the correct citation appears to be PX-173 at 209-10). According to ZTE, "the code discussed by Dr. Madisetti does not alter image data." Mot. 17. But ZTE mischaracterizes the testimony, which was that these comments accurately describe the functionality of the actual code he did review. Dkt. 259 at 30:20-31:8. He explained:



*Id.* at 30:6-15. Dr. Madisetti did not just "point[] to programmer comments," as ZTE claims, but explained to the jury that these comments actually describe the functionality of the code that he reviewed. *Id.* at 30:20-31:8. Moreover, he testified about how these and other portions of the code prove that ZTE's products mix or cull, as recited by claim 5. *Id.* at 30:6-15, 30:24-32:14.

ZTE's suggestion that ███████████████████████████ ███████████████████████████ (Mot. 17-18) is also incorrect. Dr. Madisetti explained that the code did much more: he testified about how the ████████████ ███████████████████████████████████ ████████████████████████ *See, e.g.*, Dkt. No. 259 at 30:6-15, 30:20-31:8. ZTE's expert did not dispute this, or even mention these portions of the code. Dr. Madisetti's testimony was entirely unrebutted; ZTE offers only attorney argument in response.

Dr. Madisetti also testified that, in his decades of experience in the field, mixing or

culling must be occurring in ZTE's products. ██████████████████████

████████████████████████████████████████████████████████████

█████████ *Id.* at 34:8-10. He concluded that, based on the source code he reviewed, ███████

████████████████████████████████████████████████████████

██████████████████████ *Id.* at 34:11-14; *see also id.* at 39:23-40:5 (█████████

████████████████████████████████████████████████████;

████████████████████████████████████████████████); *id.* at

32:19-34:2 (providing similar evidence for Max Duo LTE).Nothing about Dr. Madisetti's

analysis was inconsistent or "contradictory to the evidence presented in the case that ████████

████████████████████████████████████." Mot. 20. Although ZTE leans

on its expert for these arguments, ZTE's expert had no support for his conclusory assertions.

Indeed, ZTE's expert did not consider a single document that described the actual image sensors

used in ZTE's representative products:



*See* Dkt. No. 264 at 42:12-18.

*Id.* at 43:1-5.

Moreover, Dr. Madisetti explained to the jury ████████████████████

████████████████████████████████████. *See* Dkt. 260 at

13:11-17, 14:8-15:2. As illustrated in the following annotated figure, Dr. Madisetti testified that,

███████████████████████████████████████████████████████

████████████████████████████████████ *Id.* at 13:14-17. He further explained

that ████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.* at

14:22-24.



Dr. Madisetti's theory was thus entirely consistent. In fact, when asked on cross

examination ████████████████████████████████████████████

████████████████████████████ Dkt. 260 at 15:25-16:10.

ZTE now disputes Dr. Madisetti's conclusion and argues that the accused products

actually "████████████████████████████████████ Mot. 19. But it

cannot support that argument with trial evidence that would have prevented a reasonable jury

from accepting Dr. Madisetti's contrary testimony. ZTE's expert opined that ZTE's products

███████████████████, but he could not offer a single document supporting that conclusion. Dkt.

264 at 42:12-18 ("It's true that I didn't have such a document in my exhibits in my report."),

43:1-5 ("I haven't cited to a document, no."); *see also* Dkt. 264 at 57:7-15 ("I didn't have any

part numbers, you're correct."). The jury weighed that conclusory opinion against Dr.

Madisetti's extensive review of the relevant documents and source code, and it came to the

reasonable conclusion that Dr. Madisetti's testimony was more persuasive.

Post-trial, ZTE attempts to buttress its expert's testimony with reference to a Samsung

datasheet. Mot. 19 (citing Ex. 12, DX-403). But that document is not relevant—it relates to a

**<u>different</u>** sensor model, one not used in either of the representative products. Indeed, the

datasheet itself bears a different model number ███████████████) than the image sensors

used in either the Axon 7 ████████████) or Max Duo LTE (████████████████. *Compare*

Ex. 12, DX-403 *with* PX-173 at SC_ 74 (s5k2t8_lib.h file), 487 (ov13850_q13v06k_ lib.h file).

The only trial witness to discuss this document, Maxell's expert Dr. Madisetti, testified that it

described a different sensor than the one used in the accused products. Dkt. 260 at 9:1-2 ("I

cannot confirm if this is the sensor – this is the version of the sensor, ████████████████

███████"), 9:7-8 ("I cannot confirm if this is the sensor that is used."), 13:3-6, 14:4 ("There's

no evidence that this is the sensor."), 26:5-6 ("[A]gain, we don't know if it is the right product.").

Moreover, Dr. Madisetti explained why the datasheet was unreliable: per its terms, it was

only a "preliminary specification." *Id.* at 42:15-43:26. He noted that the document itself states

that ██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████ *Id.* at 41:14-20 (reading from Ex. 12, DX-403). He explained that this "preliminary

data sheet" was "subject to change" (*id.* at 42:20-22) and was a "very early" version, "not even at

the level of [version] 1" (*id.* at 43:11-12). It was therefore reasonable for the jury to credit Dr.

Madisetti's testimony about how the accused products operated rather than lean on an unreliable,

preliminary document that described a different sensor from that in the accused products. Dr.

Madisetti also explained that the Android code on ZTE's phones belies the information in the

█████████████    ██████████████████████████████████████████████████

███████████████████████████████████████████████." *Id.* at 12:22-24.

The record contains substantial evidence from which a jury could have found that ZTE's

products satisfy claim elements 5[e] and 5[f] because they mix or cull pixel lines at intervals.

*Second*, and alternatively, the record contains substantial evidence from which a

reasonable jury could have found infringement, even if the accused products ████████

█████████. This independently supports the jury verdict. *See Ericsson*, 773 F.3d at 1222.

Dr. Madisetti explained why a camera that ████████████████████████████████

███████. *See* Dkt. No. 260 at 10:17-11:9, 12:20-13:17, 14:1-15:2; *see also* Ex. 13, PX-120 at 1

(███████████████████████████████████████████████████).



"Cleaned Up" Version of Ex. 13, PX-120 at 1



. The jury considered that argument,

weighed the evidence, and found in Maxell's favor.

    *b)*   ***Limitation 5[d] ("all N number")***

   ZTE is also wrong that no reasonable jury could have found that the accused products

satisfy limitation 5[d]. Mot. 20-22. ZTE's argument is based on a waived and incorrect claim

construction requiring that the claimed array of pixels include *every* pixel line in the sensor.

   Claim 5 recites a "sensor … **having** an array of pixels … in an N number of vertically

arranged pixel lines." '493 Patent, at cl. 5 (emphasis added). That language does not preclude the

sensor from having other pixels, outside those N in the array. The specification even discloses

that the sensor may include additional pixels outside the array. *See*, *e.g.*, *id*. at FIG. 5, 5:7-15,

6:52-56. Thus, when the claim recites a "signal processing unit" that uses "all N … lines" to

capture static images, it does not mean that the unit must use every line in the sensor—only those

N lines in the array. Had the inventors intended otherwise, they would have dispensed with the

"N" language altogether and simply claimed that the signal processing unit "uses all of the

sensor's pixel lines" to capture static images. They did not.

   ZTE now argues that the claim language precludes the sensor from having pixel lines

other than those N lines in the array. Mot. 20-22. But the time to request that claim construction

has passed. "[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial." *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010). ZTE cannot raise a new claim construction issue in its post-trial motions. *See id.* Accordingly, the Court should reject ZTE's argument as untimely.

If ZTE's argument is not a request for claim construction, then it certainly fails because the record contains substantial evidence from which a reasonable jury could have concluded that the claimed array need not include every pixel line in the sensor.

*First*, Dr. Madisetti explained that this language does not preclude a sensor from having pixel lines other than those N lines in the array. *See* Dkt. 259 at 5:22-6:3. He explained that in the Axon 7, the claimed array was the 5952 pixel lines used for the highest-resolution image capture—N was 5952. *Id.* at 6:4-9.  Regardless of whether the sensor has more pixel lines outside the 5952-wide array, Dr. Madisetti testified that "you don't have to use all the lines" because the claim language merely requires that the array include "N number of vertically arranged pixel lines." *Id.* He testified that N corresponds to the number of pixel lines in used in full-resolution static mode. Dkt. 260 at 20:21-22 ("███████████████████████████████code.").

*Second*, the '493 Patent confirms Dr. Madisetti's explanation. It explains that, to conform to certain aspect ratios suitable for displaying images, the claimed device must "output … only those signals coming from a pixel area with the horizontal width conforming to the aspect ratio of the television system, as shown by a shaded area B [in Figure 5]." '493 Patent, at 6:52-56.



*Id.* at FIG. 5. As shown in the figure, that "shaded area B" does not include all pixels because it excludes those in Area A.

The patent also expressly distinguishes between "effective" pixel lines (those used to form images) and "all" pixel lines of the sensor (some of which are not used to form images):

> [T]o realize the image stabilizing function described later, four vertically arranged pixels are mixed together during motion image taking mode. When four vertically arranged pixels are to be cyclically mixed together, the signals from the area of 960 pixels (=240 scanning lines x 4 pixels) out of the 1200 vertically arranged pixels are used as effective signals and the remaining 240 pixels (=1200 (**all pixels**) – 960 (**effective pixels**)) are not used for image forming.

*Id.* at 5:7-15 (emphasis added).

Referencing these portions of the specification, Dr. Madisetti testified that using fewer than all pixel lines (*i.e.*, the "N number" of pixel lines recited in claim 5) "is consistent with the patent specification" because "[i]f you look at the figures in the patent, it leaves a border for the image stabilization." Dkt. 260 at 23:10-12; *see also* Dkt. 260 at 23:22-24. When ZTE cross-examined Dr. Madisetti about this issue, he explained that ZTE's reading of the claim is wrong because the claim "didn't say all pixel lines. It said all N number" and "N depends on the choice of the user of what sort of still images or video images they want. You can't force everyone to use a fixed resolution." *Id.* at 24:16-25:2.

> 2.      *Substantial evidence shows infringement of claim 1 of the '729 Patent.*

For claim 1 of the '729 Patent, ZTE argues that its products do not record static images

"using all effective pixels of the image sensing device," as required by limitation 1[e] (Mot. 22-23), and do not perform image stabilization (Mot. 23-25). Both points lack merit.

### a)    1[e] ("all effective pixels")

The jury had substantial evidence to conclude that ZTE's phones use "all effective pixels" to take still images. Dr. Madisetti analyzed the hardware, software, and documentation of the accused products to demonstrate that they each use all effective pixels for capturing still images. Dkt. No. 259 at 63:18-66:19 (Axon 7), 66:20-68:11 (Max Duo LTE).

Dr. Madisetti marched through similar evidence presented for claim 5 of the '493 Patent. He explained how ZTE's user manuals (Ex. 14, PX-101; Ex. 11, PX-343) and website (Ex. 8, PX-102; Ex. 10, PX-106) show how the accused products take still images using all effective pixels of the image sensing device. *Id.* at 64:9-18 (Axon 7), 66:20-67:3 (Max Duo LTE). He also presented his analysis of ZTE's source code, which confirmed that the products use all of the effective pixels of each image sensing device when taking still images in "full size mode"—just like claim 1 recites. *Id.* at 64:19-65:22 (citing PX-173 at 74-78 for the Axon 7), 67:4-14 (citing PX-173 at 471-85 and 480-81 for the Max Duo LTE).

For the Axon 7, ZTE argues that Dr. Madisetti's analysis showed that the phone had 5952x3348 effective pixels (all of which were used to capture still images), but that the preliminary Samsung data sheet (DX-403) represented that ███████████████████ ████████████████. Mot. 22-23. ZTE appears to argue that this discrepancy demonstrates that no reasonable jury could have found that the Axon 7 uses **all** its effective pixels to take still images. This is just gamesmanship.

It was reasonable for the jury to credit Dr. Madisetti's actual analysis of the Axon 7 over the preliminary data sheet for an unspecified ZTE device. As noted, he was the only witness to

testify about the data sheet, and he testified it likely relates to a **different** sensor model—not the one used in the Axon 7. *See* Dkt. 260 at 13:3-6, 14:4. And regardless of whether the datasheet was for the correct model, a reasonable jury could have concluded it did not accurately reflect the accused products. Dr. Madisetti explained the datasheet was only a "preliminary data sheet" that was "subject to change." *Id.* at 42:15-25. This was particularly so because it describes a "very early" version of the sensor. *Id.* at 43:11-12. Dr. Madisetti even noted that the document itself states that ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████." *Id.* at 41:14-20 (reading from DX-403). It was therefore reasonable for the jury to credit the results of Dr. Madisetti's analysis of the actual phone over the preliminary, third-party document ZTE relies on.

Even if the pixel count in the data sheet were correct, that would not undermine Dr. Madisetti's testimony. He testified that his analysis of the source code revealed that ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████. Dkt. No. 259 at 64:3-8 ("Q. Does [the claim] require that every single pixel in the image sensing device is being used? A. No, it does not. Q. Why not? A. Because, as I said, … you want to use all usable pixels. . . ."). ZTE offered no analysis of the code or hardware to show the Axon 7 included additional pixels that **could have been** used to capture still images. A reasonable jury could thus conclude that the phone's software used all effective pixels to capture still images.

As for the Max Duo LTE, ZTE rehashes its argument regarding limitation 5[d] of the '493 Patent. *See* Mot. 23. That argument is wrong for the same reasons explained above with respect to limitation 5[d]: it counts all of the sensor's pixels, not its "effective pixels," as

claimed. *See* supra § I.D.1.b.

> **b)**      **1[f] (*"image stabilization"*)**

ZTE argues no reasonable jury could have concluded that the accused products use the recited image stabilization technology. But the record contains a mountain of evidence to the contrary, and nothing ZTE says in its post-trial briefing calls that evidence into question.

To begin, Dr. Madisetti showed the jury ZTE's own promotional materials—which tout the Axon 7's "dual image stabilization"—included both OIS and EIS features. Dkt. 259 at 77:1-14; Ex. 8, PX-102; Ex. 9, PX-103. Thus, any argument that the claims are limited to only one of these types of stabilization is moot. Mot. 23. In any event, Dr. Madisetti testified that ███████ ███████████████████████ (*see* Dkt. 259 at 72:16-18, 75:24-76:2), and ZTE's own expert testified that ████████████████████████████████ (*see* Dkt. 264 at 13:24-25 ███████████████████████████████████████████

Dr. Madisetti then performed a live demonstration of the phone, showing it actively using the infringing image stabilization feature. Dkt. 259 at 83:22-85:5. As shown in the screenshot, the phone plainly includes "a video stabilizer" feature. *Id.*:



Ex. 15, PX-115 at 2 (Axon 7 video settings screenshot). Dr. Madisetti explained that he did not

need to walk through the same live demonstration with the Max Duo LTE because it utilizes the

same source code and gyroscope as the Axon 7. Dkt. 259 at 87:20-89:20.

Dr. Madisetti then proceeded to analyze that source code and gyroscope. He stepped

through pages of source code describing the operation of the image stabilization technology in

**both** the Axon 7 and the Max Duo LTE. Dkt. 259 at 70:23-72:21, 75:24-83:10, 83:22-86:3,

87:20-90:4; PX-173 at SC_64-73, 432-39. He showed the jury technical documentation

describing how the gyroscope in **both** phones measures camera shake (and thus image

instability) for use in the infringing image stabilization feature. Dkt. 259 at 48:10-52:7; Ex. 16,

PX-109 (Bosch BMI160 gyroscope datasheet); Ex. 17, PX-110 (STMicro LSM6DS3TR

gyroscope datasheet); *see also* Ex. 18, PX-062 (ZTE's discovery responses describing

gyroscopes used in the Axon 7 and Max Duo LTE).

The jury thus had substantial evidence that the accused products are configured to

perform the claimed image stabilization. As Dr. Madisetti explained to opposing counsel during

cross-examination: "I show[ed] you the exact code. I show[ed] you it was configured. … I show[ed] you the settings of the phone where it turned on the video stabilization. I show[ed] you how it operates. And I show[ed] you how it stabilizes. What more proof do you need that the feature is there, it's enabled, it's working and the code is all complete?" Dkt. 260 at 36:5-16; *see also id.* at 37:4-7 ("It shows the feature is enabled. It shows the feature can be operated. The website advertises it. And I showed a demonstration of it.").

ZTE argues that no reasonable jury could have believed Dr. Madisetti for four reasons.

*First*, it faults Dr. Madisetti for performing the live demonstration using only the Axon 7, and not repeating it with the Max Duo. Mot. 23. But it does not explain why the in-person demonstration was insufficient for the Axon 7 or why a reasonable jury could not have credited Dr. Madisetti's testimony that the Max Duo phone utilizes the same software.

*Second*, ZTE argues that the source code Dr. Madisetti analyzed may have never been compiled onto the accused devices. Mot. 24. ZTE bases that theory on the recorded deposition testimony of a ZTE corporate representative (Mr. Li), who testified that ██████████ ███████████████████████████████████████████████ But Mr. Li's testimony was irrelevant because, as Dr. Madisetti pointed out, ████████████████████████████████████ ███████████████████████████████. Dkt. 259 at 78:6-25 (emphasis added). Instead, Mr. Li was discussing ████████████████████████████ *Id.* at 78:6-25, 85:18-86:3.

Dr. Madisetti also called Mr. Li's testimony into question, explaining how other portions of his testimony suggested that ███████████████████████████████████████. Dr. Madisetti testified that the phone's Android operating system would invoke the infringing image stabilization software "████████████████████████████████████████ █████████████████████████████████████████████████████████████

29

████████████████████████████████ Dkt. 260 at 29:18-22. Mr. Li's

testimony was also self-serving, given that he was a ZTE representative. A reasonable jury could

have credited Dr. Madisetti's testimony over Mr. Li's.

*Third*, ZTE argues that a reasonable jury could not have found that its phones perform

image stabilization because a diagnostic test its expert performed on the phones (using the

AIDA64 app) indicated that "video stabilization is not supported by the device's software." Mot.

24-25. But the jury had good reason to reject this evidence. Dr. Madisetti showed the jury a live,

in-person demonstration of the phones. *See* Dkt. 259 at 83:22-85:5. The jury watched Dr.

Madisetti select a video stabilization option, and it watched as the phone performed video

stabilization. ZTE fails to explain why, after seeing with their own eyes that the accused phone

performs video stabilization, it was unreasonable for the jury to doubt the reliability of a free

phone application saying the phone was incapable of performing that function.

This is particularly so given that the app routinely provided inaccurate information for

even the most basic specs. Indeed, ZTE's expert admitted that the AIDA64 app did not even

provide the correct model number of the phone on which it was installed. Dkt. 264 at 30:4-32:7;

*see also* Ex. 19, DX-225 at 1 (AIDA64 report listing model number for the Axon 7 incorrectly as

P996A04). Nor did the application identify the correct sensor resolution. *See* Dkt. 264 at 33:2-16

(admitting the AIDA64 tool reported a sensor resolution that did not match the source code, the

ZTE technical documents, or even Dr. Mansoorian's own analysis); *see also* Ex. 20, DX-226 at 6

(AIDA64 report showing incorrectly the max resolution of the Max Duo LTE's rear-facing

camera as 4128 by 3096). Dr. Mansoorian admitted that the AIDA64 app simply outputs

whatever is stored in the phone's processor, "whether … accurate or not." Dkt. 264 at 29:14-18.

Weighing this unreliable "evidence" against Dr. Madisetti's testimony—which was based

on ZTE's own marketing materials, dozens of pages of source code, technical documentation, and even a live demonstration—it was reasonable for the jury to credit Dr. Madisetti's testimony.

*Fourth*, ZTE complains Dr. Madisetti did not use a Logcat tool. But Dr. Madisetti testified the Logcat file shown at trial **supports** his opinions. Dkt. 260 at 38:8-15 ("Again, as I said, I mean, it confirms here that image stabilization is met. … For video, which is exactly the same code I showed."). And ZTE's expert also ran no such test.

In sum, the jury had substantial evidence from which it could have reasonably found that ZTE's products perform the infringing image stabilization technique.

### E.     '491 and '695 Patents

   1.     *Substantial evidence supports the jury's verdict that ZTE infringed claim 8 of the '491 Patent.*

Maxell presented substantial evidence that ZTE infringes claim 8 of the '491 Patent. ZTE's argument (Mot. 26-28) fails to rebut the crucial testimony presented and, in any event, takes expert testimony out of context.

Claim 8 of the '491 Patent requires, in part, a "digital signal processor for decoding said one audio data sequence," that operates even "when the method of compression and encoding of said one compressed and encoded audio data sequence is changed." '491 Patent at cl. 8. To explain this requirement, referred to at trial as limitation 8[c], Dr. Maher analogized unpacking and setting up a tent: how demultiplexing and decoding the audio data for playback is analogous to a person unpacking camping gear (demultiplexing) and putting up a tent using the instructions (decoding). Dkt. 234 at 84:10-87:11. Using his tent analogy, he compared using one set of instructions to set up a two-person tent (one method of compression, *e.g.*, MP3 audio data) and separate instructions to set up a four-person tent (another method of compression, *e.g.*, AC3 audio data) when the type of tent (method of compression) changes. *Id.* at 86:2-7.

Dr. Maher then offered testimony as to why the accused products infringe. Dkt. 253 at 15:25-23:2. In particular, he testified that the phones use ██████████████████. Dkt., 253 at 16:2-6. Maxell introduced the ██████████████████ (Ex. 21, PX-169). *Id.* at 16:11-15; *see also* Dkt. 252 at 55:11-56:18 (describing ██████████████). It explained that the same device works with "██████████████████████████████████████████. Dkt. 253 at 16:16-19. Based on this evidence, Dr. Maher testified "it's clear that" the Axon 7 ██████████████████████████████████████████████████ ████████████████████." *Id.* at 16:20-22. The ZMAX 2 uses the same ██████████████, so it infringes in just the same way. *Id.* at 20:15-19; *see also* Dkt. 252 at 61:25-62:5.

Dr. Maher also explained how the devices detect the type of audio file and ████████ ██████████████████████████████████████████████ ██████████████████████████ when the compression method changes. Dkt., 253 at 17:12-18:9. He described how the products "████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████." *Id.* at 18:10-19:3.

In arguing that Dr. Maher "did not include any explanation" as to how the accused devices satisfy limitation 8[c] (Mot. 27), ZTE disregards this substantial evidence.

Instead of responding to this evidence, ZTE suggests that Dr. Maher said that a product would infringe claim 8 "simply by playing one song." Mot. 27. This argument is irrelevant. Even if Dr. Maher **had** issued that testimony, ZTE fails to explain why that would have negated the evidence that ZTE's devices infringe because they are capable of playing multiple audio formats. That testimony, recounted above, constitutes substantial evidence that the accused products satisfy limitation 8[c], and a reasonable jury could have credited that testimony.

In any event, ZTE misrepresents the substance of Dr. Maher's testimony. He never said

that playing a single audio file alone is evidence of infringement; he said the opposite:

> [Q.] So let me just ask you flat out, sir. Every phone, any device that plays an
> MP3, does that infringe this patent.
> A. If it's a multiplexed audio decoder that operates according to the claims and
> the limitations of the claims, yes. **If all it does is play MP3, then I don't believe**
> **that would necessarily infringe.** But if there's a plurality of decoders and remote
> procedure calls to -- to load the DSP with instructions, all of the things that I gave
> in my direct testimony, that would infringe.

Dkt. 235 at 62:16-25 (emphasis added); *see also id.* at 61:17-62:6 ("It isn't just about playing one

type of file. If that's all we needed to do, if all we needed to do was set up two-person tents, we

wouldn't need to have all the other instructions for the other kinds of tents.").

 To argue otherwise, ZTE takes portions of Dr. Maher's testimony completely out of

context. In one example that ZTE cites, Dr. Maher was not testifying that playing a single song

would infringe, but only that a single file can constitute the claimed "multiplexed audio data."

*See* Dkt. 236 at 9:22-10:23.

> 2.    *Substantial evidence supports the jury's verdict that ZTE infringed claim 1*
>       *of the '491 Patent.*

> a.    *The jury saw substantial evidence that the accused products*
>       *decode after the method of compression and encoding changes.*

Relying on the same argument presented for claim 8, ZTE says the record is insufficient

for a reasonable jury to have found the products decode the audio data sequence "after the

method of compression and encoding that data sequence changes." Mot. 28-29. ZTE is wrong for

the same reasons as for claim 8. Dr. Maher offered substantial evidence for a reasonable jury to

conclude the accused products meet this limitation *See, e.g.*, Dkt. 253 at 46:3-47:2.

> b.    *The jury saw substantial evidence that the accused products*
>       *include a CPU that is external to the DSP.*

ZTE's next argument is that "the controlling in [claim 1] requires that the CPU must be

external to the DSP," and that "Maxell has failed to offer sufficient evidence" on this issue because "Maxell's expert witness admitted that in the Accused Products the CPU is on the same chip as the DSP." Mot. 29-30. This argument turns on the incorrect premise that the CPU cannot be external to the DSP if the two are on the same chip.

The Court already rejected this argument at summary judgment. *See* Ex. 22, Dispositive Motion Hearing at 182:25-183:9. The Court disagreed with ZTE and held that whether the CPUs and DSPs were external to one another was a jury question. Dkt. 181 at 15.

The jury resolved the issue reasonably and based on substantial evidence. Dr. Maher explained why the CPUs and DSPs in the accused products were external to one another, despite being on the same chip:



Dkt. 254 at 15:1-6. (emphasis added).  Dr. Maher also showed technical documents from ZTE depicting a block diagram of the chip. He explained that the diagram confirms the ▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 23, PX-168, *see also* Dkt. 254 at 50:13-51:24.

The jury weighed this evidence and concluded that the CPU and DSP in the accused devices are indeed external to one another. This was a reasonable conclusion supported by substantial evidence. It should therefore not be disturbed post trial.

> c.  *The claim construction of "control means" does not require performing the algorithms of <u>both</u> Figures 4 and 9.*

ZTE also argues no reasonable jury could have found infringement because the Court's construction requires an infringing device to perform the algorithms of **<u>both</u>** Figure 9 **<u>and</u>** Figure

4, while the evidence showed that ZTE's devices perform the algorithm of Figure 9. Mot. 30-31.

But the Court's claim construction requires an accused product to perform **either** the algorithm in Figure 9 **or** that in Figure 4, not both. Again, the Court has already rejected ZTE's argument at the summary judgment stage. Ex. 22, Dispositive Motion Hearing at 183:18-184:8; *see also* Dkt. 209 (Case No. 5:16-cv-00178-RWS); Dkt. 181 at 15.

The Court was correct: the claim does not require the algorithms in **both** Figure 4 and Figure 9. Rather, Figures 4 and 9 are alternative embodiments. In Figure 9, unlike for Figure 4, the inventors expressly removed the transmission error checking steps (performed by steps S8, S9, and S13 from Fig. 4). *See, e.g.*, '491 Patent at 9:32-37 ("In the program switching process according to the present embodiment . . . the steps **S8**, **S9** and **S13** are deleted there that shown in the FIG. 4, therefore explanation will be given on those differences.").

If ZTE is correct that the claim requires the transmit error check of Figure 4, then Figure 9 is surplusage. ZTE's argument would exclude one of the two corresponding functions in the claim language and would improperly eliminate an express embodiment. *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) ("a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct").

Dr. Maher confirmed why Maxell's understanding of the patent is correct: ███████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ which is why the Figure 9 embodiment was disclosed by the inventors. *See* Dkt. 253 at 44:17-23. In contrast, when the ███████████████████████████████, errors in transmission are common, warranting the need for the error check step included in Figure 4. *Id.*

The Court rejected ZTE's position when it denied ZTE's motion for summary judgment

on this point. Nothing has changed since. The Court should reject ZTE's argument again.

> 3. *Substantial evidence supports the jury's verdict that ZTE infringed the '695 Patent.*

For the '695 Patent, ZTE merely adopts the same arguments it raised for the '491 patent. Mot. 31-32. Those arguments fail for the same reasons set forth above.

## F.    '193 Patent

ZTE argues no reasonable jury could have found ZTE infringed claim 1 of the '193 Patent because (1) the accused phone's controller does not "control[] a gain of said variable amplitude amplifier" (Mot. 32-35) and (2) it does not do so using a control signal based on a set of bias and gain data stored in memory (Mot. 35-37). But nothing has changed since the Court rejected both arguments at summary judgment. *See* Dkt. 155 at 1; *see also* Dkt. 181 at 14-16. The Court should reject ZTE's arguments again.

> 1.    *Substantial evidence supports a finding that the accused devices include* ▮

ZTE begins by arguing that the record contains insufficient evidence for a reasonable jury to find the accused phones have a "controller [that] controls a gain of said variable amplitude amplifier" ("VAA"). Mot. 32-35. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████. Rather than rely on only two documents, Dr. Caloyannides

supported his opinions with "six different pieces of evidence," including Ex. 26, PX-084; Ex. 25,

PX-086; Ex. 27, PX-087; Ex. 3, PX-085; Ex. 28, PX-093; and Ex. 29, PX-079. Considered

together and illuminated by his testimony, the evidence overwhelmingly supports a finding that

██████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████

    ████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

*Third*, Dr. Caloyannides supported his testimony with citation to specific portions of the

phone's specification.████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████

    ████████████████████████████████████████████

████████████████████████████████████. But ZTE provides no evidence to support

this conclusory statement, which is so plainly contradicted by the phone's specification.

*Fourth*, the evidence shows that, █████████████████████████████████████

PUBLIC VERSION



███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

Viewed as a whole, the record contains substantial evidence from for a jury to conclude

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████. That experts disagree is true in every patent trial. The jury resolves

those disputes based on evidence and credibility, which is exactly what took place here when the

jury concluded that the ZMAX 2 infringes. That decision was reasonable and supported by

substantial evidence.

    2.    *Substantial evidence supports finding the ZMAX 2 includes* ███████████

██████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████████████.

As a threshold matter, it bears clarifying the claim requires only that the **gain** be

controlled using **gain** data, not gain **and** bias data. Claim 1 recites that the controller controls (1)

gain of the VAA and (2) a bias condition of the power amplifier, and that it does so "using a set

of bias and gain data stored in said memory." '193 Patent at 11:28-31. ████████████████

████████████████████████████████████████████████████████████

████████████████. There is no requirement that either the gain or bias be controlled by both.

*First*, Dr. Caloyannides did not improperly base his opinion on other experts; he simply

used the routine practice of relying on source code assistants to identify relevant portions of the

source code for him to analyze—the exact same practice ZTE's experts employed. *See* Dkt. 264

at 54:3-24 (Dr. Mansoorian relied on a source code expert); *id.* at 80:22-25 (Dr. Mayer-Patel

relied on a source code expert). Indeed, ZTE's expert (Dr. Andrews) testified that working with

source code experts is a "common" practice. Dkt. 260 at 77:11-79:13.

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████

There was thus nothing improper about his use of assistants in formulating this opinion.

The only authority that ZTE cites **undermines** ZTE's position by declaring without equivocation

that "[a]n expert witness is permitted to use assistants in formulating his expert opinion, and

normally they need not themselves testify." *Dura. Auto. Sys. Of Ind., Inc., v. CTS Corp.*, 285

F.3d 609, 612 (7th Cir. 2002). That same decision explains that these "needn't, of course, be assistants," and that "it would make no difference if they were independent experts." *Id.* at 613. Moreover, it explains that "it is apparent from the wording of Rule 703 that there is no **general** requirement that the other expert testify as well." *Id*. (emphasis added).

ZTE's argument on this issue fails to articulate any legal standard for excluding expert opinions on this basis or to apply the facts here to that standard. In any event, the time to have made this objection was pre-trial. ZTE was aware of the factual basis of Dr. Caloyannides's testimony then, and it could have moved to exclude it. It did not.

Dr. Caloyannides walked through additional source code that further supported his

testimony.

## II.     Marking Is No Basis To Reduce Damages.

### A.     Legal standards

"[A]n alleged infringer who challenges the patentee's compliance with § 287 bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to § 287. *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017). As with any burden of production, this burden is not a heavy one, but it is a burden nonetheless. "The burden of production … refers to the obligation of the party to produce enough evidence at trial to justify sending the case to the jury." 21B Wright & Miller, *Fed. Prac.*

*& Proc. Evid.* § 5122 (2d ed.). Thus, satisfying the burden of production requires, "[a]t the very least," that the burdened party introduce enough evidence that "she would not be subject to the opponent's motion for a directed" verdict on that issue. *Id.* This degree of evidence is sometimes referred to as a "prima facie case." *Id.*

A prima facie case that a licensee failed to mark requires evidence on three issues: (1) that the plaintiff did not take reasonable efforts to ensure that the licensee marked a particular product, (2) that the licensee indeed did not mark that product, and (3) that the unmarked product practices the patent. *See Arctic Cat*, 876 F.3d at 1367 (articulating the three elements and holding that the parties there disputed only the third element). If the defendant produces no evidence on any one of these issues, it has not carried its burden of production.

**B.      The marking issue is limited to the Casio G'zOne and a subset of patents.**

As a preliminary matter, the marking issue implicates only a subset of the asserted patents and only the Casio G'zOne. As Ms. Mulhern explained, the marking issue does not apply to the '794, '493, and '729 patents because ZTE received **actual** notice of those patents and of its infringement before selling the first infringing product. *See* Dkt. 256 at 41:25-44:3; Ex. 31, PDX-042 at 34. No damages reduction is appropriate for these patents regardless of marking.

Because the marking issue does not apply to the '794, '493, and '729 patents, it also does not apply to the products ZTE identifies as the "Nikon cameras." Mot. 38. The briefing is unclear as to which of the asserted patents ZTE believes the Nikon cameras practiced, but its interrogatory responses suggest that the allegations are limited to the '794, '493, and '729 patents, for which it received actual notice before infringing. Ex. 32, PX-065 at 70.

**C.      ZTE failed to meet its burden of producing evidence that Casio did not mark the G'zOne.**

ZTE failed to create a triable issue over marking because it produced **no evidence**

**whatsoever** that Casio made or sold the G'zOne in the United States without marking it. ZTE did not introduce the G'zOne product itself or even a picture of one, so that the jury could determine whether it was not marked or not. It did not produce any instruction manuals, marketing materials, or any other communications from Casio to the public concerning the G'zOne so that the jury could determine whether those communications failed to identify the relevant patents. Nor did it produce copies of Casio's website to allow the jury to determine whether the marking information was absent from where one would have expected it to appear. In short, it introduced no evidence whatsoever suggesting that Casio failed to mark the G'zOne. ZTE therefore failed its burden of production on this issue.

ZTE acknowledges it carried the burden of production on this issue (Mot. 38) and argues it met that burden by eliciting testimony from ███████████████████████████████████ ████████████████████████. Mot. 39. But that is relevant only to the first issue of marking—*i.e.*, whether Maxell took reasonable measures to ensure Casio marked its products. It says nothing about whether Casio actually sold the G'zOne to the public without the marking.

Because ZTE produced no evidence that Casio sold the G'zOne without marking, it failed to meet its burden of production on this issue. Its argument must therefore fail.

**D.     ZTE failed to meet its burden of producing evidence that the G'zOne practices a claim of any asserted patent.**

ZTE also failed to satisfy its burden regarding whether the G'zOne practices the asserted patents. *First*, the only record evidence ZTE identifies as purportedly relevant to this issue is Mr. Nakamura's testimony that ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████. Mot. 38-39; *see also* Dkt. 252 at 14:15-16. But this circumstantial evidence is not enough to create a triable issue over marking, particularly when ███████████████████

46

████████████████████████. "[W]hen a party relies upon circumstantial evidence," "the court must determine whether or not a reasonable jury could infer that" the party's contention is correct. *Fed. Prac. & Proc. Evid.* § 5122. Here, ███████████████ ██████████████████████████ is no evidence at all that any particular Casio product licensed under that agreement actually practiced any or all of the relevant patents. While the burden of production is low, it still exists.

*Second*, ZTE **itself** contended that the G'zOne did not practice the asserted patents; it repeatedly told the jury that the G'zOne does **not** practice the asserted patents. *See, e.g.*, Dkt. 239 at 70:25-71:24; Dkt. 254 at 65:12-17. ZTE could not have met its burden of producing evidence that the G'zOne practiced the patents when it actually argued the exact opposite at trial. Surely this point was not missed by the jury. To be sure, ZTE's position was a contingent one—*i.e.*, that the G'zOne practiced the patents **only if the accused products did**. *See id.* But ZTE gave the jury no reason to credit that position either.

Because ZTE produced no evidence that the G'zOne practices any or all of the asserted patents, it failed to meet its burden for this additional reason.

### E.     The Court should not reduce the damages award.

Because ZTE failed to satisfy its burden, the jury was entitled to reject ZTE's marking argument. The jury was given specific instructions, including on marking, and made its decision based on the evidence before it. That decision should not be disturbed. Moreover, ZTE is wrong to assert that ZTE Corporation's notice of the patents cannot be imputed to ZTE (USA). *See* pages 52-53, *infra*. Nor does ZTE have any basis to contest Ms. Mulhern's introduction of testimony addressing ZTE's marking argument, given that it was responsive to ZTE's contention.

### III.     Substantial Evidence Supports The Jury's Willfulness Verdict.

ZTE challenges the jury's willfulness verdict on the basis that (1) ZTE did not know of the asserted patents before the complaint was filed on November 18, 2016 (Mot. 42-48), and (2) it did not believe the asserted patents were valid and infringed (Mot. 48-52). But substantial evidence supports the jury's contrary verdict on both issues.

#### A.     ZTE USA knew of the asserted patents.

ZTE begins by arguing it could not have infringed willfully because it learned of the asserted patents for the first time when Maxell filed the Complaint on November 18, 2016. Of course, this argument does nothing to shield ZTE from the verdict that it willfully infringed **after** November 18, 2016. *See Blitzsafe Texas, LLC v. Volkswagen Grp. Of Am., Inc.*, No. 2:15-cv-1274 (Lead Case), 2016 WL 4778699 at *7 (E.D. Tex. Aug. 19, 2016) ("The Complaint notifies the … defendants of the patents they are accused of infringing"). And, in any event, substantial evidence supports a verdict that ZTE willfully infringed before the complaint as well.

> 1.     *Maxell presented substantial evidence that ZTE Corporation was aware of each asserted patent before the complaint.*

As explained in Maxell's own post-trial motion on this issue, Maxell presented substantial evidence for a reasonable jury to find that ZTE Corporation had pre-suit knowledge of each of the asserted patents.

**'317 Patent.** The record evidence shows that ZTE became aware of the '317 Patent by June 10, 2013, when it received a letter inviting it to discuss licensing a patent portfolio and identifying the '317 specifically. Ex. 33, PX-287 at HM_ZTE011381; *see also* Dkt. 233 at 71:8-20. ████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 33, PX-287 at HM_ZTE011381. That chart included an analysis of how ZTE's products infringe the '317 Patent. *See* Ex. 34, PX-303; *see*

*also* Dkt. 233 at 73:11-21; Dkt. 257 at 4:15-5:12 (█████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████).

ZTE says nothing to call this evidence into question. It fusses over Mr. Nakamura's

accidental reference to the "June 13th letter" rather than the "June 10th letter" (Mot. 47), but the

context of Mr. Nakamura's statement makes clear that he simply misspoke and that he was

testifying about the June 10, 2013, letter. *See* Dkt. 233 at 78:14-15 (referring to "the June '13

letter from Hitachi"). The jury was entitled to make this inference.

ZTE further takes issue with Mr. Tian's testimony to the extent it relied on "Exhibit 47,"

the listing of patents and claim charts attached to the June 10 letter. ZTE asserts the exhibit was

purportedly not moved into evidence. Mot. 47-48. That is wrong. The material in Exhibit 47 was

broken into exhibits PX-289 and PX-303 and introduced by Mr. Nakamura, who testified before

Mr. Tian. *See* Ex. 36, PX-289; Ex. 34, PX-303; Dkt. 233 at 73:2-74:8, 78:11-80:22 (introducing

the exhibits). ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████.

**'794 Patent.** ZTE was also made aware of the '794 Patent by the same June 10, 2013

letter. *See* Ex. 33, PX-287; Ex. 36, PX-289; Dkt. 233 at 79:4-12; Dkt. 257 at 5:17-6:9 ██████

█████████████████████████████████████████). The parties later discussed the '794

Patent specifically when Maxell highlighted the '794 Patent in an "executive summary" of

Maxell's patent portfolio. *See* Ex. 35, PX-293; Dkt. 233 at 84:7-25, 87:4-8.

**'493 and '729 Patents.** ZTE was also made aware of the '493 Patent (a family member of the '729 Patent) when it received the June 10, 2013 letter. *See* Ex. 33, PX-287; Ex. 36, PX-289; Dkt. 233 at 79:13-16 (testifying that the '493 Patent was listed in the June 10 letter); Dkt. 257 at 8:14-19 (███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████.

**'193, '695, and '491 Patents.** ██████████████████████████████████████

███████████████████████████████████████. But the patents were in the smartphone patent portfolio that ZTE was discussing with Maxell. Dkt. 233 at 12:2-5. ZTE now argues that the mere fact that the patents were within the scope of the meetings (without proof that the parties actually discussed these particular patents) cannot support a finding that it "knew" about the patents before the complaint for purposes of willfulness. Mot. 46.

ZTE is mistaken. It was reasonable for the jury to conclude that during the negotiations, ZTE either (1) "evaluated the patent portfolio" or (2) was "willfully blind in not doing so." *Monolithic Power Sys., Inc. v. Silergy Corp.*, 127 F.Supp.3d 1071, 1074 (N.D. Cal. 2015). The fact that the parties had extensive discussions about licensing a portfolio that included the '193, '695, and '491 Patents is sufficient circumstantial evidence to support the jury's verdict that ZTE knew of those patents. "The law makes no distinction between the weight or value to be given to either direct or circumstantial evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

Here, the evidence demonstrated that by the second of the seven face-to-face meetings, on

August 5, 2014, ZTE had been given an "executive summary presentation of Maxell's

smartphone portfolio." Dkt. 233 at 84:11-19; *see also* Ex. 37, PDX-030 at 1 (showing the extent

of the negotiations between the parties). A reasonable jury could have concluded from this that

ZTE knew of the patents for which it was negotiating, actually or constructively.

Alternatively, the jury could have reasonably concluded ZTE willfully blinded itself to

these patents, making its infringement willful. *See Monolithic Power*, 127 F.Supp.3d at 1074. As

the Supreme Court has held, a party that "willfully blinds" itself to its infringement of a patent

acts "knowingly." *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766-769 (2011). A

party may therefore satisfy the knowledge requirement and infringe "willfully" if it

"purposefully keeps [itself] in ignorance" about the patent. *Id.* Here, a reasonable jury could have

concluded that, if ZTE really did not know about the '193, '695, and '491 Patents—three patents

within the portfolio it had protracted meetings about—it was because ZTE willfully blinded itself

to those patents. This is a reasonable conclusion because it would make little sense to negotiate a

license to a portfolio without knowing what patents are in that portfolio. If ZTE indeed did not

know about the scope of that portfolio, the jury could have inferred this was done willfully.

The record contains substantial evidence from which a reasonable jury could have

concluded that ZTE either knew of all the asserted patents (whether actually or constructively) or

that it willfully blinded itself to them. And ZTE presented no evidence to the contrary.

> 2. *Maxell presented substantial evidence for the jury to impute ZTE*
> *Corporation's knowledge of the patents to ZTE USA.*

ZTE also argues that even if ZTE Corporation was aware of the asserted patents, that

knowledge cannot be imputed to ZTE USA because Maxell did not prove specific instances

where the knowledge was transferred. *See* Mot. 43 ("evidence indicating a transfer of knowledge

also must be proven"). But as Maxell's post-trial motion makes clear, imputation of knowledge from a parent to a subsidiary is a question of fact with no categorical rules. *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986) ("[i]n respect of willfulness, there cannot be hard and fast *per se* rules"). Maxell presented evidence showing that ZTE USA and ZTE Corporation were sufficiently close to impute the knowledge of one to the other.

As outlined in Maxell's motion (Dkt. 285 at 19-21), substantial evidence supports a finding that the relationship between ZTE Corporation and ZTE USA is so close that imputation is appropriate. The two companies share a single integrated sales channel, wherein ZTE USA acts as ZTE Corporation's U.S.-based distributor, and the two have shared employees. ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. This is substantial evidence that supports imputing ZTE Corporation's knowledge to ZTE USA.

The cases ZTE cites only confirm that imputation is appropriate here. *Princeton Dig. Image Corp. v. Harmonix Music Sys.* found it highly important for imputation whether in-house legal counsel of the first entity handled patent matters for the second entity. No. 12-1461-LPS-CJB, 2018 WL 1890200, at *4-5 (D. Del. Apr. 16, 2018). Here, ZTE Corporation's patent negotiation team had authority to negotiate for and bind ZTE USA. Dkt. 234 at 43:10-21. ████

████████████████████████████████████████████████████████████

████████████████. Dkt. 255 at 22:3-10; Dkt. 262 at 65:7-66:1.

*Software Research, Inc. v. Dynatrace LLC* deals with imputation from a predecessor-in-interest rather than from a parent to child corporation. But even there, the court examined "whether these companies were only those whose assets were acquired or whether they were part

52

of a merger." No. 18-cv-00232-EMC, 2018 WL 3241043, at *13-14 (N.D. Cal. July 3, 2018). In other words, "the nature of the relationship" matters. *Id*. Here, Maxell offered evidence that the two companies, ZTE Corporation and ZTE USA, were a part of the same sales apparatus, with ZTE USA acting as the exclusive domestic seller of the devices that ZTE Corporation manufactures. Dkt. 231 at 75:1-3; Dkt. 234 at 43:19-21, 44:2-7. This is a close relationship that fully supports imputation of knowledge.

The remaining cases ZTE cited are inapposite because they merely discuss circumstances where Plaintiff failed to link the relevant entities at all or to show anything more than a subsidiary relationship. *See*, *e.g.*, *InCom Corp. v. Walt Disney Co.*, CV15-3011 PSG (MRWx), 2016 WL 4942032, at *1-2,  4-5 (C.D. Cal. Feb. 4, 2016) ("Plaintiff… has not alleged any facts" relevant to imputation); *ReefEdge Networks, LLC v. Juniper Networks*, *Inc.,* 29 F. Supp. 3d 455, 457-8 (D. Del. 2014) ("ReefEdge makes no specific allegations linking the knowledge Ms. McKenzie may have acquired from her work at Symantec to her work at Juniper"); *ZitoVault, LLC v. IBM Corp.*, No. 3:16-CV-0962-M, 2018 WL 2971131, *3 (N.D. Tex. Mar. 29, 2018) ("Plaintiff needs to set out… more than just the bare facts of the parent/subsidiary relationship").

In contrast to these cases, Maxell here has presented substantial evidence from which a reasonable jury could impute ZTE Corporation's knowledge to ZTE USA.

**B.   ZTE USA knew or should have known its conduct risked infringement.**

The record supports the jury's finding that ZTE knew, or should have known, of a high risk that it was infringing the asserted patents. ZTE's argument misstates the law and facts.

*1.   ZTE cannot defend by arguing it believed the patents were invalid.*

ZTE begins by arguing that "Maxell did not offer any evidence that ZTE USA ever believed the asserted patents were valid and enforceable," and that it was "Maxell's burden to

prove" that subjective belief. Mot. 49-50. ZTE is wrong about the law. To secure enhanced damages, Maxell must prove that ZTE engaged in conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). One way is proof that ZTE knew of the patent and infringed anyway—that is, that its infringement was willful. *Ibid*.

Contrary to the crux of ZTE's argument now, in order to prove willful infringement, Maxell did not have to present affirmative evidence that ZTE had a *subjective* belief that the patents were valid. That gets things backwards. ZTE offers no authority to support this argument. *Arctic Cat* merely observes that, to constitute willfulness, the infringer must have known or should have known of a valid and enforceable patent. 876 F.3d at 1371. The patents at issue here—presumed valid by virtue of statute, 35 U.S.C. § 282—fit the bill.

ZTE has presented nothing to rebut this presumption—no internal communications, no legal opinions, no pre-suit investigation, no representations to Maxell. Nothing at all to support any arguable good faith belief of invalidity. This case is thus similar to *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-00011-RSP, 2018 WL 2149736, at *9 (E.D. Tex. May 10, 2018). Like there, here, "the jury could have inferred intent from circumstantial evidence." *Id*. ZTE has offered no evidence whatsoever that anyone at the company "believed the [asserted patents were] invalid or not infringed." *Id*.

Indeed, the courts are clear that if an infringer wishes to defend against subjective willfulness on the basis of a subjective belief of invalidity, it is the infringer who must present the evidence. *See*, *e.g.*, *Barry v. Medtronic, Inc.*, 230 F. Supp. 3d 630, 650 (E.D. Tex. 2017).

Moreover, in a related context, the Supreme Court held that a defendant's belief that the patent is invalid is no defense at all to whether he acted "knowingly" to induce infringement.

*Commil USA, LLC v. Cisco Sys.*, 135 S. Ct. 1920, 1928 (2015). The Supreme Court's reasoning

was simple: "because infringement and validity are separate issues under the Act, belief

regarding validity cannot negate the scienter required" for infringement. *Id.* Thus, "[w]hen

infringement is the issue, the validity of the patent is not the question to be confronted." *Id.* This

guidance makes clear that a belief that the patent is invalid does little to demonstrate that a

defendant's infringement was not willful. Just as a belief of invalidity cannot negate the scienter

requirement that the defendant "knowingly" induced another to infringe, it cannot negate the

scienter requirement that he "willfully" infringed himself. Thus, whether ZTE thought the

patents were invalid may say little or nothing about whether it acted willfully.

ZTE's own behavior undermines ZTE's contention. Its many meetings with Maxell about

the patents are indicative of a party that believes the patents are valid. ZTE's decision at trial not

to challenge the validity of four of the seven asserted patents is likewise. In sum, ZTE is wrong

about the law, and it has no evidence whatever showing a good faith belief of invalidity.

>    2.    *Substantial evidence supports the jury's finding that ZTE knew or should*
>          *have known of a high risk that ZTE was infringing.*

ZTE next argues that Maxell is obligated—but failed—to show subjective knowledge of

infringement. Mot. 50-52. To begin with, ZTE misstates the legal standard for showing

subjective willfulness. It argues that this standard requires that the defendant be "informed of …

the activity that is believed to be an infringement." Mot. 50 (citing *Optis Wireless Tech., LLC v.*

*Huawei Techs. Co.*, 2:17-cv-00123-JRG-RSP, 2018 WL 3375192, at *6-7 (E.D. Tex. July 11,

2018). And it contends that Maxell failed to meet that standard because it did not

"communicate[] to ZTE USA a specific charge of infringement by a specific accused device."

Mot. 50.

That is not the test. The standard for finding willfulness is not whether the plaintiff

notified the infringer that a particular product infringes and how, but whether the defendant's

conduct created "a **_risk_** of infringement that was 'either known or so obvious that it should have

been known to the accused infringer.'" *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d

1358, 1362 (Fed. Cir. 2016) (quoting *Halo*, 136 S. Ct. at 1930 (emphasis added), *overruled on*

*other grounds by* 138 S. Ct. 2129, 2133 (2018)). There is no need to "find[] that Maxell

communicated to ZTE USA a specific charge of infringement by a specific accused device."

Mot. 50. A determination that ZTE should have known of a sufficiently high risk of infringement

is enough. There is substantial evidence in the record supporting that conclusion.

      **'317 Patent.** Maxell's predecessor-in-interest, Hitachi, provided ZTE an infringement

claim chart for the '317 Patent in the June 10, 2013. (Ex. 34, PX-303); *see also* Dkt. 233 at

73:11-21. Maxell had subsequent negotiations with ZTE,



*See* Ex. 35, PX-293 at 2, 7-8); Dkt. 233 at 84:7-25,

86:9-14

. Ex. 38, PX-299; Dkt. 233 at 90:4-93:6. This is substantial evidence that ZTE

knew or should have known that there was a risk it infringed the '317 Patent. ZTE makes much

of the fact that the claim chart Hitachi provided addressed         a device not at issue in

this case. But it was reasonable for the jury to find that, after viewing a claim chart mapping the

'317 Patent to one of its smart phones, ZTE should have been aware of the risk that others of its

phones may also infringe.

      **'794 Patent.** Maxell presented substantial evidence that the '794 Patent was a significant

topic in the technical discussions between Maxell and ZTE on August 5, 2014. *See* Ex. 35, PX-

293 at 2, 13 (emphasizing the '794 Patent); Dkt. 233 at 84:7-25, 87:4-8 

). Based on these discussions, and the slide Maxell

presented to ZTE outlining the same infringement theory on which Maxell prevailed at trial, the

jury had substantial evidence on which to determine that ZTE should have known of a high risk

it was infringing the '794 Patent.

**'493 and '729 Patents.** 

. Dkt. 257 at 10:22-

11:6. Given it was established that ZTE knew of the '729 Patent, it is reasonable to conclude

ZTE would have known it was a camera patent being discussed. In sum, there was evidence to

conclude the discussion of the "camera" patents at the August 5, 2014, meeting between the

parties provided ZTE with knowledge of the risk that it infringed the '493 and '729 Patents.

For the remaining '193, '695, and '491 Patents, and indeed for all seven of the asserted

patents, beyond ZTE's own knowledge of these patents in the context of licensing negotiations,

Maxell's complaint on November 18, 2016, showed ZTE that there was a risk of infringement of

each patent. The jury ultimately agreed. Dkt. 228 (Verdict). But ZTE continued selling infringing

smartphones, demonstrating that its infringement was willful. *See ZitoVault,* 2018 WL 2971131,

at *3. ("The Court can reasonably infer that if Defendants infringe, then they are deliberately

continuing to do so despite notice in the Complaint."); *Apple Inc. v. Samsung Elecs. Co.*, 258 F.

Supp. 3d 1013, 1027 (N.D. Cal. 2017) ("Samsung's post-filing conduct alone can serve as the

basis of a jury's willfulness finding and an award of enhanced damages").

57

There is no evidence that ZTE took any actions whatsoever to avoid infringement of any asserted patent at any point, either before or after the Complaint was served, or established any good faith belief in non-infringement of Maxell's patents. Accordingly, substantial evidence supports the jury's finding of willful infringement of each of the asserted patents.

## IV.    The Court Should Not Reduce The Jury's Damages Award And Replace It With Its Own Determination As To An Ongoing Royalty Rate

ZTE's contention regarding post-verdict damages (Mot. 52-57) repeats arguments the Court denied in ruling on ZTE's motion *in limine*. *See* Dkt. 181 at 2.

The legal framework is clear. The Federal Circuit has held it proper for juries to award lump-sum damages that compensate a patent owner for infringement for post-verdict conduct: "the district court properly denied [plaintiff's] request for an ongoing royalty because the jury award compensated [plaintiff] for both past and future infringement through the life of the patent." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1300-01 (Fed. Cir. 2015). Likewise, a Court in this District recently upheld a jury's damages assessment in the form of a lump sum that "conservatively account[ed] for future sales of accused products based on forecasts and inferences drawn from [defendant's] past sales." *Ericsson Inc., et al, v. TCL Commc'ns Tech. Holdings, Inc.*, No. 2:15-cv-00011-RSP, 2018 WL 2149736, at *7 (E.D. Tex. May 10, 2018); *see also LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 188 (S.D.N.Y. 2002) ("A reasonable royalty may be computed in various ways, including a lump-sum royalty based on expected sales or a running royalty based on a percentage of actual sales.).

The primary case on which ZTE relies, *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 2017 WL 3034655, at *2-3 (E.D. Tex. July 18, 2017), is not to the contrary. It stated that an ongoing royalty was appropriate because, in that matter, "[t]he parties did not argue to the jury (or the Court) that the damages award would constitute compensation for a paid-up license, nor

did they otherwise indicate that the jury should consider future conduct in making its damages assessment." *Id.* at *3. That is not the case here.

As the Court earlier held, Ms. Mulhern "calculate[d] a per-unit royalty rate and a 'lump sum payment, payable at the time of trial that would compensate Maxell for future infringement of the Asserted Patents from the trial date through the life of the Patents-in-Suit.'" Dkt. 199 at 2.

To be sure, Ms. Mulhern calculated the lump sum by evaluating a royalty rate. *See* Dkt. 255 at 15:18-16:10; Dkt. 256 at 34:14-39:22; Ex. 31, PDX042 at 30-33. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.

ZTE provides no support for its apparent position that a lump sum calculation cannot take a royalty rate into account. To the contrary, in *Ericsson*, the Court explicitly noted that "Ericsson's damages theory looked identical to a running royalty analysis, yet both sides agreed

that damages would be in the form of a lump sum." 2018 WL 2149736, at *6. And that makes

sense: it is reasonable, when considering a lump sum payment, to consider a per unit rate and

then make an estimate as to total sales.

Not only is ZTE's argument legally meritless, it is waived. At trial, ZTE did not

challenge the use of a lump sum damages award. ZTE did not present any evidence or argument

it would not have entered into a lump sum license, ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ ZTE waived arguments to the contrary.

Another premise of ZTE's argument, that the jury necessarily adopted Ms. Mulhern's

damage model wholesale, is not supported. While the jury may have adopted Ms. Mulhern's

calculation, that is not the only possibility. Ms. Mulhern provided a range of possible fee-per-

unit rates for each patent. If the jury had utilized the upper rate in each range, as opposed to the

rates actually used by Ms. Mulhern, and applied such rates to past sales only, it would have

yielded damages of roughly ████████. *See* Ex. 31, PDX042 at 29 (exhibiting royalty ranges for

each patent); *id*. at 30 (royalty base through trial). Thus, the evidence presented at trial would

have supported a jury award of up to ████████ based on past damages alone. And it is clear the

jury considered these issues, having asked for both damages experts' slide presentations during

deliberations.

For these reasons, the Court should not disturb the jury's award. *See Ericsson*, 2018 WL

2149736, at *4 ("A jury's decision with respect to an award of damages 'must be upheld unless

the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based

only on speculation or guesswork.'" (internal citations omitted)).

60

## V.      The '317 And '794 Are Valid Under Section 101

Maxell and ZTE both moved for summary judgment regarding the patent eligibility of the

'317 and '794 Patents. *See* Dkt. 287 (Maxell Mot.) at 1-12. As Maxell argued, each of these

patents is (1) eligible under step one of *Alice* because it is directed to a technological

improvement rather than an abstract idea, and (2) separately eligible under step two of *Alice*

because substantial evidence does not support the jury's verdict that the claims recite only

conventional components and combinations (a factual determination relevant only to step two).

*Id*. Maxell's arguments are presented in detail in its opening brief and are incorporated by

reference and need not be restated here. Rather, Maxell briefly addresses here a few items ZTE

now raises that Maxell had not already covered in Maxell's opening brief.

### A.      '794 Patent recites eligible subject matter.

ZTE argues that the claimed invention is ineligible because its function "can be

performed by a human." Mot. 59. This is both wrong and irrelevant. It is wrong because a human

cannot monitor battery levels or send control instructions to function devices without software

and hardware assistance. Contrary to ZTE's representations (Mot. 59), Dr. Phinney did not

testify that these are human activities; he simply testified that mere human involvement in

**authorizing** these activities on the accused devices does not impact **infringement** (*see* Dkt. 240

at 17:9-17; Dkt. 257 at 32:18-23). ZTE's argument is also irrelevant because the Supreme Court

has expressly rejected the proposition that a claim is ineligible if it recites steps that "can be

performed by a human." *See Bilski v. Kappos*, 561 U.S. 593, 607 (2010) (rejecting "[t]he

argument that business methods are categorically outside of § 101's scope").

### B.      '317 Patent recites eligible subject matter

ZTE misreads the patent specification when it argues that the invention's hardware is

"just like those of ordinary portable telephone and PHS terminals." Mot. 61 (quoting '317 Patent

at 2:64-3:1). That is only the **first half** of the sentence:

> the portable terminal of the present invention is provided with data communi-
> cation, input, and display devices just like those of ordinary portable telephones
> and PHS terminals, **as well as a device for getting location information and a
> device for getting direction**

'317 Patent at 2:62-67. Read in context, the sentence says the exact opposite of what ZTE cites it

for: the addition of the location and orientation devices means that the claimed phone is **not** "just

like … ordinary portable telephones." *Id.*

Neither does ZTE explain what it means when it calls the "user interface" improvements

enabled by the new hardware combination "only a desired result" rather than "a particular way of

performing that function." Mot. 61. The result of the claimed invention is "a portable terminal …

[that] can supply location information easier for the user to understand during walking with use

of a narrow screen of a portable telephone." '317 Patent at 2:52-55. The "particular way" of

achieving that result is to equip the device with components for detecting location and

orientation *(see id.* at 2:58-67) and to use those components to "display changes according to a

change of said portable terminal orientation for walking navigation," as described in the

specification *(see id.* at 10:55-57). This is exactly what the law requires when it distinguishes

"one claiming only a result" from "one claiming a way of achieving it." *SAP Am., Inc. v.

InvestPic, LLC*, 890 F.3d 1016, 1021-22 (Fed. Cir. 2018) (collecting cases).

Finally, ZTE's conclusion that the claims "preempt the field of providing 'walking

directions'" lacks any seriousness. Mot. 63. As ZTE itself observed on the immediately

preceding page of its brief, even the background section of the '317 Patent expressly discusses

prior art technology that provides walking directions, but in a different way. *See* Mot. 62 ("The

patent further recognized the existence of a 'conventional PDA terminal with GPS' … available

at the time of its alleged invention.") (emphasis omitted).

At bottom, the claims of these patents recite particular combinations of hardware that enable particularly recited functionality, and there is no evidence in the record that these were routine or conventional at the time of invention. ZTE bore the burden of proving this issue by clear and convincing evidence, and no reasonable jury could have concluded that it had. The Court should therefore grant Maxell judgment as a matter of law that the '794 and '317 Patents are eligible under *Alice*.

## VI.    ZTE Is Not Entitled To A New Trial

The Court should reject ZTE's scattershot attempts to obtain a new trial. For the avoidance of all doubt, Maxell incorporates all prior arguments into this Rule 59 answer.

### A.    Legal Standard

Under Rule 59, a court should grant a new trial only if it finds that "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985). Only those errors that affect a party's "substantial rights" are proper grounds for a new trial. Fed. R. Civ. P. 61; *see also Narcisse v. Ill. C. G. R.R. Co.*, 620 F.2d 544, 547 (5th Cir. 1980). This requires a prejudice analysis: "A ruling has affected the substantial rights of the party if, when considering all of the evidence presented at trial, the ruling had a substantial effect on the outcome of the trial." *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 430 (5th Cir. 2014).

Moreover, when a new trial is requested on the basis of allegedly improper evidence, testimony, or argument, a "party may claim error" only if "the error affects a substantial right of the party" and the party "timely objects or moves to strike" on a specific ground. Fed. R. Evid.

103(a); *see also SSL Servs., LLC v. Citrix Sys.*, 940 F. Supp. 2d 480, 492 (E.D. Tex. 2013), aff'd,

769 F.3d 1073 (Fed. Cir. 2014) ("SSL has waived any objection it might have had to the

testimony presented at trial because it failed to object to such testimony during the direct

examination at trial").

### B.      Public Events Did Not Deny ZTE A Fair Trial.

#### 1.      *The Court properly screened for prejudice via voir dire.*

ZTE's motion for a new trial on the basis of pretrial publicity is largely a retread of its

denied "emergency motion" for a continuance. Dkt. 157. ZTE again entirely fails to mention or

give deference to the recent guidance by the Supreme Court about this issue: *Skilling v. U.S.*, 561

U.S. 358 (2010). As previously discussed by Maxell (Dkt. 183), in *Skilling*, the former CEO of

Enron sought to move his criminal trial away from Houston, arguing that "hostility toward him

in Houston, coupled with extensive pretrial publicity, had poisoned potential jurors." 561 U.S. at

369. But the Supreme Court held that "pretrial publicity—even pervasive, adverse publicity—

does not inevitably lead to an unfair trial." *Id*. at 384.

As shown by *Skilling*, the proper procedure to screen for any adverse publicity is to use

an "extensive screening questionnaire and followup *voir dire*" to remove jurors with prejudice.

561 U.S. at 384; *see also Thurmond v. Compaq Comput. Corp.*, No. 1:99-CV-0711(TH), 2000

WL 33795090, at *13 (E.D. Tex. Mar. 1, 2000) ("voir dire is the cure for any 'bias' that may

result from exposure to pre-trial publicity").

The procedure the Court here followed closely mirrored that approved in *Skilling*. The

Court "solicited from the parties questions the court might use to screen prospective jurors," and

the parties submitted a joint proposed questionnaire. Dkt. 126; *Skilling*, 561 U.S. at 370. The

forty prospective jurors submitted their answers to a lightly modified version of this

questionnaire, which the parties reviewed prior to *voir dire*. Mot. at Ex. O. The Court also

specified that there would be "no time limit" to the *voir dire* process, and that there would be

individual interviews of the prospective jurors. Dkt. 187; *Skilling*, 561 U.S. at 373-74 ("after

questioning the venire as a group, the District Court brought prospective jurors one by one to the

bench for individual examination"). Indeed, the individual examination of jurors followed the

*Skilling* procedure closely: the Court asked about knowledge of the parties, focused on any

answers that stood out, and then permitted the parties to ask any follow up questions:

- "What do you know, and which party is it you know something about?"
- "How did ZTE? Do you know anything about ZTE?"
- "What's the latest development that you – that you're aware of?"
- "Is there a chance that's going to affect your verdict in this case, do you think?" (question by ZTE's counsel).
- "Because of the knowledge that you have… are you saying that you think you would be more inclined to believe Maxell's… allegations that ZTE stole something from them?" (question by ZTE's counsel).

Dkt. 230 at 77:9-83:13; *compare with Skilling*, 561 U.S. at 374.

The Court further asked the prospective jurors if there was "any reason they could not sit

on this jury as a fair and impartial juror," and received no responses. Dkt. 229; *see Skilling*, 561

U.S. at 373 ("[t]he District Court first emphasized to the venire the importance of impartiality").

Later, after selecting a jury, the Court instructed the jurors "not to talk about the case until

everything is completed" and that "the impartiality of jurors is the most important -- one of the

most important concepts in our judicial system." Dkt. 230 at 163:18-165:17; *see Skilling*, 561

U.S. at 375 ("[a]fter the jurors took their oath, the District Court told them they could not discuss

the case with anyone or follow media accounts of the proceedings").

The Court's process obviously worked. ZTE focuses on three prospective jurors,

██████████████████████, suggesting they indicated bias. Mot. 65-66. But none of them were

on the jury. ZTE has no basis to say that the individuals who were **actually** selected harbored any prejudice to ZTE. To the contrary, the *voir dire* process ensured no such jurors were selected.

In light of the Court's exhaustive *voir dire* procedures, ZTE's motion is without merit.

### 2.    *ZTE has not demonstrated a presumption of prejudice.*

Citing *Mayola v. Alabama*, 623 F.2d 992, 996-97 (5th Cir. 1980), ZTE argues that prejudice should be presumed here. Mot. 67-69. *Mayola* discusses the "*Rideau* principle of presumptive prejudice," which it notes "is only 'rarely' applicable… and is confined to those instances where the petitioner can demonstrate an 'extreme situation' of inflammatory pretrial publicity that literally saturated the community in which his trial was held." 623 F.2d at 997. That is because "virtually every case of any consequence will be the subject of some press attention." *Id*. ZTE's request for a "presumption" of prejudice fails for several reasons.

*First*, as *Skilling* held, *Rideau* applies only in contexts such as a televised and "dramatically staged admission of guilt [that] was likely imprinted indelibly in the mind of anyone who watched it." *Skilling*, 561 U.S. at 382-83. The evidence shown there was **directly specific** to the issues in the present case; it was "evidence of the smoking-gun variety." *Id*.

No smoking gun evidence of ZTE's infringement of Maxell's patents was broadcast in the media prior to trial. ZTE does not point to a single article, "imprinted indelibly" upon the minds of the jurors or not, that mentions **any** alleged infringement of Maxell's patents by ZTE. *See* Motion; *Skilling*, 561 U.S. at 383. ZTE's argument about generic "adverse coverage" of ZTE does not lead to a conclusion of presumed prejudice; rather, it merely supports the exact *voir dire* procedure the Court used to screen for bias. *Skilling*, 561 U.S. at 384 ("the extensive screening questionnaire and followup *voir dire* were well suited to that task").

*Second*, *Mayola*—authority on which ZTE relies—actually undercuts ZTE's argument. *Mayola* denied relief to the party seeking a new trial. 623 F.3d at 998-99. In *Rideau*, the Fifth Circuit observed, the party had "adduced evidence that his televised confession had been seen by tens of thousands of citizens in the Louisiana parish of 150,000 from which the jury had been drawn." *Id*. at 998. That holding did not apply, however, where the litigant failed "to adduce any evidence of the scope of the exposure of the [jury] population to the offensive news coverage on which he relies." *Id*. at 999. *Mayola* thus establishes that the mere identification of adverse coverage is insufficient to establish a presumption. Here, ZTE fails to show the penetration of the news coverage. Indeed, during *voir dire*, many jurors were **unaware** of any news about ZTE. Dkt. 229 at 68:23-73:8 (only three jurors out of forty indicated any knowledge of news regarding ZTE). Even prospective juror ███, cited by ZTE in its brief, testified that he had "not seen anything" about ZTE in the news. Dkt. 230 at 48:5-9.

*Third*, that ZTE won certain issues also defeats its contention; this is "of prime significance" in showing no presumption of prejudice. *Skilling*, 561 U.S. at 383. The jury found for ZTE regarding whether the claim elements of the '794 and '317 Patents were well-understood, routine, and obvious. Dkt. 228 (Verdict). A jury deciding a case based on prejudice, rather than the evidence, would not have rendered a split verdict. Thus, the present situation stands "in marked contrast" to the facts of the cases relied upon by ZTE to show presumed prejudice. *Skilling*, 561 U.S. at 383.

*Fourth*, ZTE's reliance on *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966), is misplaced. The prejudice in *Sheppard* arose only because of "media interference with courtroom proceedings **during** trial," where "[b]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, thrusting jurors into the role of celebrities."

*Skilling*, 561 U.S. at 380, 382 n.14 (citing *Sheppard*, 384 U.S. at 353, 355) (internal quotations omitted). No bedlam occurred here. The lack of a "carnival atmosphere" at trial makes a citation to *Sheppard* "particularly misplaced." *Skilling*, 561 U.S. at 380, 382 n.14.

    *3.*  *ZTE has not demonstrated any actual prejudice.*

   ZTE's argument for actual prejudice also lacks merit. Actual prejudice must be shown "not as a matter of speculation but as a demonstrable reality." *U.S. v. Chagra*, 669 F.2d 241, 250 (5th Cir. 1982). "Proof of such prejudice is normally made by reliance upon the juror's voir dire responses." *Id.*

   ZTE argues that "it is simply inconceivable that the majority [of the jurors] knew nothing about the widespread media coverage." Mot. 69. This is just "speculation," not "actual, identifiable prejudice" applicable to a single identifiable juror. *Chagra*, 669 F.2d at 250. And no resort to speculation could be proper here: the *voir dire* procedures confirmed that the selected jurors had no bias. Dkt. 229-30; *see United States v. Pratt*, 728 F.3d 463, 473-74 (5th Cir. 2013) ("several jurors reported exposure to pretrial publicity, and some even admitted to forming negative opinions… [n]evertheless, we see nothing in these comments to demonstrate that the jurors would have been unable to perform their duties").

   ZTE also argues that six of the eight jurors "indicated they do not trust foreign corporations." Mot. 69. But **each** of these six jurors also indicated that they do not trust "large companies," and four of the six indicated that they do not trust "Government agencies." *Id*. at Ex. O. General distrust does not equal animosity, and it is certainly not evidence of *per se* prejudice. *See Pratt*, 728 F.3d at 473-74. ZTE had abundant opportunity at *voir dire* to explore any particular prejudice on the part of these jurors in response to their answers, but it found none. Dkt. 229-30. Accordingly, ZTE's claim of actual prejudice is unsupported.

### C.     The Closing Argument Does Not Warrant A New Trial.

Identifying two isolated passages, ZTE asserts that Maxell committed "misconduct"

during closing rebuttal, warranting a new trial. Mot. 70-71. This argument is insubstantial.

To begin with, ZTE has waived this argument by failing to make a contemporaneous

objection. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 509 (5th Cir. 2012) ("Although

Baisden alleges prejudice now, he raised no objection to the statements at trial. Baisden has thus

waived his objection to these statements, and this court need not consider them.").

ZTE is, in any event, wrong. A new trial is warranted only if "improper closing argument

irreparably prejudices a jury verdict or if a jury fails to follow instructions." *Wallner v. Ziegler*,

470 F. App'x 230, 232 (5th Cir. 2012). ZTE must show that "the interest of substantial justice is

at stake." *Hall v. Freese*, 735 F.2d 956, 961 (5th Cir. 1984). ZTE cannot satisfy this standard.

Maxell's comment regarding Mr. Lam was proper. ZTE introduced Mr. Lam several

times at trial, but never had him take the stand. *See, e.g.*, Dkt. 229 at 55:25-56:5; Dkt. 230 at

3:21-4:17; Dkt. 231 at 72:24-25. ZTE now argues it never stated he would testify. But Maxell

never made that assertion either. Maxell merely recalled for the jury that ZTE's counsel

repeatedly pointed to Mr. Lam to demonstrate the importance of this case to ZTE, but never let

him testify. Dkt. 247 at 97:2-17, 131:11-20. Maxell's statements were not false and were not

without basis in record. That Maxell also told the jury to think about what the record evidence

might mean does not render its closing improper. *See, e.g.*, *Welch v. All Am. Check Cashing,

Inc.*, No. 3:13-CV-271-TSL-JCG, 2015 WL 4066495, at *12 (S.D. Miss. July 2, 2015) (rejecting

request for new trial based on argument that closing statement contained improper speculation

that a witness did not appear because he did not want to provide unfavorable testimony).

The second quote to which ZTE points is argument from Maxell's counsel inviting the

jury to make the inference that ZTE Corp.'s knowledge of the patents would be shared with ZTE

USA. Mot. 71. This is an entirely appropriate inference for Maxell to ask the jury to draw. As

shown (pages 52-53, *supra*), there was evidence in the record to support it.

These supported and proper statements stand in stark contrast to ZTE's counsel's

improper statements, as noted in Maxell's opening brief. Additionally, ZTE cannot show

prejudice. Two snippets from a trial record spanning more than 3,000 pages is not the sort of

alleged conduct that can form the basis of a new trial. ZTE relies (Mot. 71) on *In re Isbell

Records, Inc.*, 774 F.3d 859, 872-73 (5th Cir. 2014). But *Isbell* denied a request for a new trial,

and each of the factors at issue there are present here. First, here, as in *Isbell*, there was no

contemporaneous objection. *Id*. at 872. Second here, as in *Isbell*, there were no statements that

"contain material facts not in evidence." *Id*. at 872. Maxell argued for inferences to be drawn

from record material. Third, as in *Isbell* (*id*. at 872-73), any potential prejudice was cured by the

Court's instruction that "[t]he statements of counsel are not evidence; they are only arguments. It

is important for you to distinguish between the arguments of counsel and the evidence on which

those arguments rest. What the lawyers say or do is not evidence." Dkt. 247 at 42:20-25. There

was no error; there is certainly no basis for a new trial.

> ### D.     Admission Of Prior Licensing Negotiations To Establish Willfulness Does
>           Not Warrant A New Trial.

The Court properly held prior to and during trial that evidence regarding Maxell and ZTE

Corp.'s prior licensing negotiations were admissible to show knowledge of the asserted patents.

ZTE is wrong to contend that either Rule 408 or the NDA prohibited this evidence. *See, e.g.*,

*Baisden*, 693 F.3d at 508 ("Generally, any error in admitting or excluding evidence is not

grounds for a new trial.") (citing Fed. R. Civ. P. 61).

### 1. *FRE permits disclosure of prior licensing negotiations.*

Rule 408 prohibits admission of settlement offers and negotiations "to prove or disprove the validity or amount of a disputed claim." But Rule 408(b) allows the Court to admit offers and negotiations "for another purpose." One such purpose is to prove willfulness. As the Court has recognized, parties also may use prior negotiations to demonstrate knowledge of the asserted patents. *See* Dkt. 199, Order Denying ZTE Motion *in Limine*, at 3 ("The Advisory Committee Notes to the Rule recognize the significant case law providing that Rule 408 is inapplicable when evidence of the compromise is offered to prove notice."); *see also, e.g.*, Fed. R. Evid. 408 Advisory Committee Notes on 2006 Amendments ("Rule 408 is inapplicable when evidence of the compromise is offered to prove notice."); *France Telecom S.A. v. Marvell Semiconductor Inc.*, 82 F. Supp. 3d 987, 1009 (N.D. Cal. 2015) (plaintiff's notice letter was "relevant to [plaintiff's] willfulness allegation, and is appropriately admitted under Rule 408."); *ZiiLabs Inc., Ltd. v. Samsung Elecs. Co.*, 2015 WL 8293585, at *1-2 (E.D. Tex. Dec. 8, 2015).

ZTE has no authority precluding use of this material to show **knowledge** of the patents. It argues this material may be used as a **defense** to willfulness. We do not disagree. This does not, however, establish that this evidence is inadmissible for purposes of **proving** willfulness.

In order to ensure that any use of prior negotiation materials comported with Rule 408, the Court considered each challenged document individually prior to its admission into evidence, permitting party argument with respect to each. As a result, Maxell was required to redact information from certain exhibits to limit them to asserted patents, and the Court required Maxell to place on the record statements that other patents appearing in the documents are not asserted. *See, e.g.,* Dkt. 233 at 68:16-70:10, 75:21-78:1. Such restrictions limited any potential for improper use or prejudice from admission of the documents.

ZTE also asserts that the presentation of Mr. Tian's testimony "contained multiple violations of FRE 408" (Mot. 74), but ZTE does not elaborate on what those violations are. Neither the Court nor Maxell should guess. In any event, Mr. Tian established ZTE Corporation's awareness of certain asserted patents. Dkt. 257 at 3:5-11:12. He testified:



*Id.* at 4:21-5:8. ZTE provides no explanation or argument of how testimony going directly to ZTE's first awareness of the asserted patents runs afoul of Rule 408. It does not.

   2.  *The NDA does not prohibit disclosure of prior licensing negotiations.*

  The Court also correctly held that the NDA between Maxell and ZTE Corp. does not preclude admission of evidence of prior licensing negotiations.

  As this Court recognized, the NDA set forth restrictions on a **<u>Receiving</u>** party's disclosure of a Disclosing party's confidential information, but does not restrict a **<u>Disclosing</u>** party from relying on or disclosing its own confidential information. Dkt. 199, Order Denying ZTE Motion *in Limine*, at 4 (citing Ex. 40, NDA, ¶ 2.a-d). Admitted exhibits PX-283, 287, 289, 293, 294 and 303 all constitute Maxell's own confidential information, which Maxell was free to disclose without restriction under the NDA. *See, e.g.*, *ZiiLabs*, 2015 WL 8293585, at *2 ("[T]he 2011 NDA does not impose restrictions on a party's use of its own 'Proprietary/ Confidential Information.' For that reason also, Plaintiff may use its own information even if it is

'Proprietary/Confidential Information' as evidence of willful infringement.").

The Court also properly recognized that the NDA includes a provision for use of these documents in litigation. Ex. 40, NDA, ¶ 3.d (████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████); Dkt. 199 at 4 (reciting the NDA's exception for production in response to litigation document requests and holding "if the confidential information has been produced in this litigation, the NDA does not prevent its use."). ZTE appears to assert that the exception does not apply because there was no "court order." Mot. 75. The Discovery Order governing this case, however, required the production "all documents … that are relevant to the pleaded claims or defenses involved in this action…." Dkt. 33 at 3. The prior negotiation materials between Maxell and ZTE are unquestionably relevant and thus production was required under the Court's Discovery Order.

ZTE's authority does not require the Court to expand the reach of the NDA beyond its written bounds. In *IBM v. Groupon, Inc.*, 2018 U.S. Dist. LEXIS 100333, at *3-4 (D. Del. June 15, 2018), the Confidential Disclosure Agreement between the parties contained a clause that IBM would not seek enhanced damages by asserting willful patent infringement, which rendered use of negotiation materials not relevant to any issue being litigated. In *ZiiLabs*, the Court precluded use of material exchanged under an NDA where the parties agreed not to use the materials "to support an allegation of willful infringement" or "as notice of patent infringement." 2015 WL 8293585, at *1. However, in *ZiiLabs*, the Court did permit disclosure of material exchanged under a prior NDA that did not have similar language. *Id.* at *1-3. Here, the NDA clearly permitted the particular use of the documents in this case.

### 3. *ZTE invited any arguable error.*

ZTE's argument is also contradicted by ZTE's own behavior. Throughout trial ZTE has

tried to use prior licensing negotiations and its Rule 408 objections as both a sword and a shield.

After ZTE initially raised its Rule 408 concerns, Maxell agreed to remove from its

exhibit list a document representing an actual monetary offer previously exchanged between the

parties and to refrain from referencing any such offer at trial, accepting that presentation of such

evidence may be contrary to Rule 408. *See, e.g.*, Dkt. 231 at 10:7-11. After vehemently arguing

its position, and securing Maxell's agreement, ZTE itself placed the offer in the record. Dkt. 252

at 27:20-25. It was ultimately ZTE, not Maxell, that disregarded Rule 408 and attempted to use

prior negotiations to demonstrate the value of Maxell's claims. ZTE also repeatedly entered into

evidence Maxell's prior licensing offers with ███████████. *See, e.g*., Dkt. 231 at 98:16-

99:2; Dkt. 252 at 14:9-22, 19:1-16; Dkt. 256 at 58:23-67:16, 69:2-8, 93:22-94:5; Dkt. 262 at

34:19-36:10. Such evidence was intended to persuade the jury with respect to the value of

Maxell's infringement claim. ZTE thus sought to use negotiation evidence at its discretion.

There is no justifiable basis for ZTE to take such inconsistent positions. It cannot

disregard Rule 408 and introduce evidence of Maxell's prior negotiations with third parties when

it sees a benefit to doing so and then assert the Rule to keep out prior negotiations.

### E. A New Trial Is Not Warranted Based on ZTE's Allegation Regarding the Entire Market Value Rule.

ZTE's argument (Mot. 75-70) regarding evidence going to the entire market value fails

for two independent reasons: ZTE waived the argument by failing to make contemporaneous

objections and, in any event, there was no error.

### 1. *ZTE did not object to evidence of the total revenues of the accused products.*

ZTE has waived this argument by failing to present timely objections to the evidence and

argument that it now challenges. *See SSL Servs.*, 940 F. Supp. 2d at 492.

ZTE places significant emphasis on *Uniloc*. There, however, the defendant maintained an objection during trial "specifically under the entire market value rule to use of a demonstrative pie chart" that compared the royalty rate to the total sales volume of the accused products. 632 F.3d at 1319. The defendant had also filed a motion *in limine* to avoid evidence of the entire market value of the products, and the plaintiff had "explicitly said that it would not be relying on the entire market value of the accused products." *Id*. Here, ZTE does not point to **any** objection that it made before or during the trial to the admission of Maxell's reference to the total revenues of the **accused products**. ZTE has waived this claim. Fed. R. Evid. 103(a) (requiring a timely objection on a "specific ground").

In reply, ZTE cannot argue that a motion *in limine* was sufficient objection. Prior to trial, ZTE objected to evidence relating to "ZTE Corporation's size, market power, overall financial status, total revenue, and operating profits." Dkt. 133 at MIL No. VI. ZTE did not object to the use of the total revenues of the accused products, nor did it reference the Entire Market Value Rule. *Id*. During argument on this motion, Maxell made clear that "[a]ll we want to be able to do is talk about the sales of the accused products. [] It is not just the number of units sold but also the revenues for those units sold." Dkt. 186 at 100:8-12. In response, ZTE asserted that it was concerned only with the exclusion of ZTE Corporation's **total** revenue and that they "agree information regarding the accused products is relevant." *Id.* at 101:5-9. Thus, ZTE did not object to Maxell's use of the revenues of the **accused products**, and certainly not with the required specificity. *See Uniloc*, 632 F.3d at 1319 (the objections were "supported by Microsoft's *in limine* filings and Uniloc's response, where Uniloc explicitly said that it would not be relying on the entire market value of the accused products").

ZTE knew, moreover, that Maxell intended to introduce evidence of the total revenues of the accused products. Beyond the representations by the parties at the pretrial conference, Maxell provided ZTE's counsel with the demonstrative slide deck to be used with the testimony of Ms. Mulhern. Ex. 41, 2018.06.21 Email from D'Andrea to O'Connell. This slide deck showed that Ms. Mulhern intended to refer to the total revenues of the accused products in her testimony. Ex. 31, PDX042 at 36. This was consistent with her expert report. Ex. 39, Mulhern Rpt. at ¶¶ 45-47. After receiving the slide deck, ZTE lodged objections with the Court regarding other aspects of Ms. Mulhern's slides, but **not** with respect to the slide concerning effective royalty rates. Ex. 42, 2018.06.21 Email O'Connell to Haley. Nor did ZTE object at the Court conference prior to Ms. Mulhern taking the stand or while Ms. Mulhern testified. Rather, consistent with the position ZTE took with respect to its motion *in limine*, ZTE objected to certain slides because they contained information regarding sales of **unaccused** products, while not objecting to testimony of an effective royalty rate based only on **accused** products. *Id.*

ZTE is thus attempting to engage in classic sandbagging. It knew this evidence was coming, yet it did not object. Now, having lost, ZTE seeks a new trial on this basis. Basic rules of fairness foreclose ZTE's request for a new trial on this ground.

Beyond the foregoing, two aspects of ZTE's behavior preclude the argument. First, ZTE acknowledged at the pretrial conference that evidence of the revenues of the **accused** products was relevant. Dkt. 186 at 101:5-9. Contrary to ZTE's argument now, Maxell never strayed from the parties' agreement; it only ever referenced sales of **accused** products. *See* Mot. 80. "By specifically agreeing to the admission" of this evidence, ZTE has "waived its objection." *James Corp. of Opelousas v. Tangie Const. Co.*, 7 F.3d 230 (5th Cir. 1993).

Second, ZTE invited this testimony. ZTE **itself** referred to the sales of the accused

products, calling Maxell's damages amount "ridiculous," "crazy," and "astronomical," before

attacking Ms. Mulhern's methodology on the basis that she "███████████████████████

████████████████████████████████████████████." Dkt. 230 at 42:24-

43:5; Dkt. 231 at 97:21-23, 98:24-99:2. Maxell could not have responded to ZTE's attacks

without referring to the accused product revenues and translating the damages number, based on

a fee-per-unit, into an effective average royalty rate. *See, e.g.*, Dkt. 256 at 45:15-19 ("I wanted to

then express that as a percentage so that we can compare that to the ██████, for example….").

Having opened the door to this argument, ZTE cannot seriously complain about the use of this

evidence.

### 2.     *There was no error or prejudice.*

Setting aside ZTE's waiver of the issue—and ZTE's affirmative invitation for use of the

evidence—there is no basis to find error. In *Uniloc*, the Federal Circuit affirmed the district

court's exercise of its discretion to order a new trial. *Uniloc*, 632 F.3d at 1321. There, entire

market evidence was a central part of the plaintiff's presentation. *Id*. at 1319-20. Not so here.

To begin with, the relevant evidence here showed that royalties are often assessed as a

percentage of sales price. Both Ms. Mulhern and ZTE's expert, Dr. Kennedy, ████████████

████████████████████████████████████████████████████████████████████

████████████. *See, e.g.*, Dkt. 255 at 26:18-25, 27:23-28:4; Dkt. 262 at 15:19-22, 17:16-21; Ex.

31, PDX042-11; Ex. 43, DX-390.8; Ex. 44, PX-230 at Article 4. In these circumstances,

evaluating total sales is proper. *See, e.g.*, *Mondis Tech., Ltd. v. LG Elecs., Inc.*, No. 2:07-CV-

565-TJW-CE, 2011 WL 2417367, at *3 (E.D. Tex. June 14, 2011) (holding use of entire market

value rule economically justified where most reliable licenses were based on the entire value of

the licensed products).

77

Moreover, the evidence here was a minor part of Maxell's damages case. In the main, the evidence consisted of past licenses, evaluations of comparable patents, evaluations of comparable patents, ZTE's public emphasis on various features, and an analysis of the *Georgia-Pacific* factors. Dkt. 255 at 16:1-22:2; *see also* Ex. 31, PDX-042 at 29.

ZTE's complaints regarding statements made by Maxell's counsel during closing argument (Mot. 77) should be dismissed for the additional reason that counsel is afforded wide latitude in closing to suggest inferences to be drawn from the evidence. *See, e.g., U.S. v. Valas*, 822 F.3d 228, 245 (5th Cir. 2016); *Milwaukee Elec. Tool Corp. v. Snap-on Inc.*, 288 F. Supp. 3d 872, 895-897 (E.D. Wis. 2017). ZTE has not shown why any reference to the revenues of **accused** products, in the context presented, "had a substantial effect on the outcome of the trial." *U.S. Bank Nat'l Ass'n*, 761 F.3d at 430.

### F.    Ms. Mulhern's Reference To The *MMI* Rate Does Not Warrant a New Trial.

Earlier, ZTE unsuccessfully moved to preclude Ms. Mulhern from relying on survey results to arrive at a value of the '317 patent; ZTE argued in part that her use of the litigated rate in *MMI v. Apple* ("the *MMI* rate") was faulty because the rate was set by the Court as a matter of law. *See* Dkt. 207 (Case No. 5:16-cv-00178-RWS, consolidated), at 14. This Court disagreed. Dkt. 181 at 3. ZTE now raises the issue again, citing a case from a different district.

ZTE's authority, *Sentius Int'l v. Microsoft Corp.*, No. 5:13-cv-00825-PSG, 2015 WL 451950, at *5-6 (N.D. Cal. Jan. 27, 2015), does not, however, hold that a "JMOL rate" may never be used to determine damages. It states merely that such reliance "presents concerns similar to the issues that make courts wary about using settlement agreements to establish patent damages." *Id.* As with settlement agreements, the admissibility of litigated rates depends on the facts. *See, e.g.*, *In re MSTG, Inc.*, 675 F.3d 1337, 1348 (Fed. Cir. 2012); *Sprint Commc'ns Co. v.*

*Comcast Cable Commc'ns LLC*, 225 F. Supp. 3d 1233, 1248 (D. Kan. 2016) ("[P]rior verdicts may be relevant if sufficiently comparable to the circumstances in the case at bar.").

Here, the facts render Ms. Mulhern's use of the *MMI* rate reasonable. As an initial matter, Ms. Mulhern provided ample explanation for why use of the rate was reasonable. *See* Dkt. 256 at 21:8-23:16. If ZTE disagreed, it could have addressed that via cross examination or through its own expert. In materially similar circumstances, courts have allowed such testimony. *See, e.g.*, *MobileMedia Ideas, LLC v. Apple Inc.*, 209 F. Supp. 3d 756, 765 (D. Del. 2016) (permitting reliance on prior litigated rates, reasoning that the expert was "sufficiently detailed" in his analysis and "offer[ed] reasons for his patent selection and acknowledge[d] and adjust[ed] the royalty rates for the differing circumstances of the prior litigation.").

Nothing about that analysis was flawed. Indeed, the *MMI* rate was set by a court, which acknowledged its responsibility to set a reasonable royalty. *See, e.g.*, *Ironworks Patents, LLC v. Apple, Inc.*, Civ. No. 10-258-SLR, D.I. 748 at 20-27 (D. Del. Jun. 12, 2017). Importantly, that court relied on evidence addressing a hypothetical negotiation; it examined certain license agreements as well as an incremental benefits analysis that utilized royalty rates from a prior litigation. *Id.* at 21; *MobileMedia Ideas*, 209 F. Supp. 3d at 764-765. Finally, that court did not blindly adopt the damages number advanced by the plaintiff in that case. Rather, it adopted the "lowest damages award supported by sufficient evidence" (corresponding to the lower end of the expert's calculated hypothetical negotiation range). *Id.* at 21, 27. (Nor was there any danger of prejudice here, unlike *Sentius*, as *MMI v. Apple* did not involve any party to this case.)

The Court correctly denied ZTE's *Daubert* motion to preclude Ms. Mulhern from relying on the *MMI* rate. ZTE's complaint goes to the weight of the evidence, not admissibility. Yet,

even after having its prior motion denied, ZTE did not cross-examine Ms. Mulhern on the *MMI*

rate at all. *See* Dkt. 256. ZTE's argument is no basis to disturb the verdict.

ZTE's contention also fails because it cannot demonstrate prejudice. The *MMI* rate was

just one input into Ms. Mulhern's calculus of a damages figure for the '317 patent. She relied

extensively on prior license agreements, ZTE's emphasis on the features enabled by the '317

patent, and a *Georgia-Pacific* analysis. *See, e.g.*, Dkt. 255 at 21:18-22:2; Dkt. 256 at 11:14-

12:20, 31:8-32:2; Ex. 31, PDX042 at 11, 18, 22, 29. Ultimately, Ms. Mulhern arrived at a rate

████████████████████████████████████████████████████████████████

████████████████████████████████████████ *See*, Ex. 31, PDX042 at 29. Given the

extensive other data points she presented—all of which support the jury's damages award—the

Court's decision to admit or exclude reliance on the *MMI* rate is not a basis for a new trial. *See*

Fed. R. Civ. P. 61; *Waterman v. McKinney Indep. Sch. Dist.*, No. 15-40458, 2016 WL 1127429,

at *3 (5th Cir. 2016) ("Even if the district court's evidentiary ruling is an abuse of discretion, it is

subject to harmless error analysis and does not justify reversal unless it affected substantial rights

of the complaining party." (internal quotations and citations omitted)).

## VII.  CONCLUSION

For the reasons set forth above, ZTE's Motion for Judgment as a Matter of Law and

Motion for New Trial should be denied in all respects.

Dated: August 24, 2018

By:     */s/ Jamie B. Beaber*

Geoff P. Culbertson
Kelly Tidwell
Patton, Tidwell & Culbertson, LLP
2800 Texas Boulevard (75503)
Post Office Box 5398
Texarkana, TX 75505-5398
Telephone: (903) 792-7080
Facsimile: (903) 792-8233
gpc@texarkanalaw.com

Jamie B. Beaber
Alan M. Grimaldi
Kfir B. Levy
James A. Fussell, III
Baldine B. Paul
Tiffany A. Miller
Justin Park
Saqib J. Siddiqui
Bryan C. Nese
William J. Barrow
Michael T. Lindinger
Alison T. Gelsleichter
Clark S. Bakewell
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
jbeaber@mayerbrown.com
agrimaldi@mayerbrown.com
klevy@mayerbrown.com
jfussell@mayerbrown.com
bpaul@mayerbrown.com
tmiller@mayerbrown.com
jpark@mayerbrown.com
ssiddiqui@mayerbrown.com
bnese@mayerbrown.com
wbarrow@mayerbrown.com
mlindinger@mayerbrown.com
agelsleichter@mayerbrown.com
cbakewell@mayerbrown.com

81

Robert G. Pluta
Amanda S. Bonner
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
rpluta@mayerbrown.com
asbonner@mayerbrown.com

*Counsel for Plaintiff Maxell, Ltd.*

## CERTIFICATE OF SERVICE

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served this 24th day of August, 2018, with a copy of this document via electronic mail pursuant to Local Rule CV-5(d).

*/s/ Jamie B. Beaber*

Jamie B. Beaber